UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE
FARM FIRE & CASUALTY COMPANY,

                  Plaintiffs,                              Case No.

v.

PHYSICIANS GROUP OF SARASOTA, L.L.C.,
PHYSICIANS GROUP, L.L.C. a foreign Delaware corporation,
GARY KOMPOTHECRAS, DAVID BALOT,
DB MEDICAL CONSULTING, INC.,
W.S. MEDIA, INC. a foreign Delaware corporation,
W.S. MARKETING, INC., and WILLIAM SIGELAKIS,

                  Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company (collectively, "State Farm"), for their Complaint against Defendants Physicians Group of Sarasota, LLC, Physicians Group, LLC (collectively, "Physicians Group"), Gary Kompothecras ("Kompothecras"), David Balot ("Balot"), DB Medical Consulting, Inc. ("DB Medical Consulting"), W.S. Media, Inc. ("WS Media"), W.S. Marketing, Inc. ("WS Marketing") (if not stated otherwise, WS Media and WS Marketing are collectively referred to as "WS Media"), and William Sigelakis ("Sigelakis") allege as follows:

## I.    NATURE OF THE ACTION

1.      This action involves a massive fraud scheme by the Defendants to obtain from State Farm Personal Injury Protection ("PIP Benefits") and Medical Payments Coverage ("MPC Benefits") insurance benefits (collectively, PIP Benefits and MPC Benefits are referred to as "No-Fault Benefits") for services and treatments purportedly rendered to patients at Physicians Group clinics in Florida, which are owned by Kompothecras.  The services and treatments were not lawful when they were rendered because the Defendants intentionally violated several important criminal, civil and administrative laws to lure unwitting motor vehicle accident victims to receive the services and treatments at the Physicians Group clinics, namely the Patient Brokering Act (Fla. Stat. § 817.505), the Patient Self-Referral Act of 1992 (Fla. Stat. § 456.053), the Anti-Kickback Statute (Fla. Stat. § 456.054), the Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*) ("FDUTPA"), the laws establishing grounds for disciplinary action against chiropractors who engage in false and misleading advertising (Fla. Stat. § 460.413(d), (f) and (l)), and administrative rules prohibiting chiropractors from engaging in deceptive and misleading advertising (F.A.C. Rule 64B2-15.001(2)(a), (b) and (k)).  The driving force behind the Defendants' scheme is to exhaust their unsuspecting patients' limited No-Fault Benefits, without regard to whether the patients may have health insurance that might otherwise cover some or all of Physicians Group's charges, thereby preserving their No-Fault Benefits for other medical services that the patients may truly need.

2.     Because patients were obtained by the Physicians Group clinics through these unlawful means, the services and treatments rendered to these patients were not lawful when they were rendered.   *See* Fla. Stat. § 627.732(11) ("lawful" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment.")   Therefore, neither the patients nor State Farm owed Physicians Group's claims or charges for the services and treatments at issue.   *See* Fla. Stat. § 627.736(5)(b)(1)(b) ("An insurer or insured is not required to pay a claim or charges . . . [f]or any service or treatment that was not lawful at the time rendered.")

3.     The success of the Defendants' scheme depends on referrals to Physicians Group from a purportedly independent and legitimate medical and legal referral service, the 1-800-ASK-GARY hotline ("ASK GARY").   The Defendants have aggressively marketed ASK GARY through a multi-million dollar advertising campaign including billboards, radio, television and the internet, soliciting motor vehicle accident victims to call ASK GARY for referrals to health care providers who can treat their injuries, regardless of whether they believe they are injured, and to personal injury attorneys ("PI Attorneys") who can represent them on their injury claims.

4.     Contrary to its advertising, ASK GARY is not an independent and legitimate medical and legal referral service.   In fact, it is secretly owned and controlled by Kompothecras and exists to unlawfully steer all unwitting callers to Kompothecras' own clinics, the Physicians Group clinics, and to PI Attorneys who pay fees to ASK GARY to obtain client referrals and, at least in some instances, secretly agree to refer

their clients to the Physicians Group clinics.  The PI Attorneys are motivated to enter into these arrangements because they stand to profit substantially from the bodily injury ("BI") and uninsured/underinsured motorist claims ("UM").

5.      To conceal the unlawful nature of their activities and facilitate the illusion that ASK GARY is an independent and legitimate medical and legal referral service, the Defendants have created shell companies with nominee owners to purportedly own and operate ASK GARY.  Although these shell companies and nominee owners have purported to be independent of Kompothecras and Physicians Group, they are in fact nothing of the sort.  Instead, the shell companies and nominee owners are all working for, or at the direction of, Kompothecras, with the common and unlawful purpose of steering all unwitting callers to treat at Physicians Group clinics and for representation by PI Attorneys who have paid fees to ASK GARY for referrals and, at least in some instances, secretly agreed to refer their clients to the Physicians Group clinics.

6.      The Defendants have never identified a single patient who was referred from the ASK GARY referral service to any health care provider other than Physicians Group.  Furthermore, at least one attorney has confirmed the unlawful *quid pro quo* cross-referral arrangements to which PI Attorneys were required to agree in return for receiving client referrals through ASK GARY.  Specifically, PI Attorney Anthony Gadlage, who worked for the Kentucky office of a Florida-based personal injury law firm, Winters & Yonker, has provided a sworn affidavit confirming that Kompothecras required PI Attorneys who received referrals from ASK GARY to refer their clients to Kompothecras-owned clinics for treatment.  *See* Ex. 1.  Although Attorney Gadlage

worked for the Kentucky office of Winters & Yonker, he explains in his affidavit that: Winters & Yonker and Kompothecras appeared to track the number of cross-referrals; that he was pressured to refer his clients to the Kompothecras-owned clinics in Kentucky; and that he was fired from Winters & Yonker when he refused to refer his clients to the Kompothecras-owned clinics because he did not think it was in his clients' best interests to treat at those clinics. *Id.* Attorney Gadladge also confirms in his affidavit that all referrals between Winters & Yonker and ASK GARY were coordinated through ASK GARY personnel and an attorney in Winters & Yonker's Tampa, Florida office. *Id.*

7. In or about October 2012, Winters & Yonker was disbanded after its founders were suspended for ethical violations. From at least 2008 through 2012, however, Winters & Yonker represented more clients who presented claims to State Farm and treated at Physicians Group than any other law firm in Florida. The large number of Winters & Yonker clients who also treated at Physicians Group clinics in Florida was not coincidental and, in fact, confirms that Kompothecras and Winters & Yonker had the same unlawful cross-referral arrangements in Florida that they had in Kentucky.

8. Kompothecras and the ASK GARY referral service have been a focus of at least two investigations by the Florida Bar, one in 2007 and the other in 2011. As a result of the 2007 investigation, lawyers who participated in the ASK GARY legal referral service were cited for obtaining clients through improper advertising. Although the 2011 investigation recognized that lawyer referral services owned by non-lawyers, such as ASK GARY, are not subject to the Rules Regulating the Florida Bar, the investigation concluded with unanimous recommendations for the Florida Bar to prohibit

lawyers from: (a) accepting client referrals from any referral service that also refers callers to any other type of professional service, including clinics, for the same incident, transaction or circumstance, and (b) referring a client to any other professional service, including clinics, in consideration of the lawyer's receipt of referrals from any lawyer referral service.  *See* Ex. 2 at p. 26.   These are exactly the kinds of cross-referral arrangements that are at the core of the ASK GARY business model.

9.      In 2007 and 2011, at or about the time of each Florida Bar investigation and undoubtedly in response to each investigation, the Defendants created shell companies with nominee owners and took other actions to foster the illusion that ASK GARY was a legitimate medical and legal referral service that was independent from Kompothecras and Physicians Group, when, in fact, Kompothecras continued to secretly own and/or control ASK GARY to refer all callers to Physicians Group clinics and to PI Attorneys who paid ASK GARY for client referrals and, at least in some instances, secretly agreed to refer their clients to Physicians Group clinics.

10.     Since 2005, State Farm has paid Physicians Group more than $19 million in No-Fault Benefits.  The chart attached hereto as Exhibit 3 identifies more than 100 claims in which State Farm paid more than $480,000 in No-Fault Benefits to Physicians Group for services and treatments that were not lawfully rendered to State Farm insureds because the patients were unlawfully obtained and referred by ASK GARY to Physicians Group clinics through violations of criminal, civil and administrative laws, namely violations of the Patient Brokering Act, Anti-Kickback Act, Self-Referral Act, FDUTPA and prohibitions against fraudulent, false, deceiving and misleading advertising by

chiropractors.   Information identifying other State Farm insureds who were also unlawfully obtained and referred by ASK GARY to Physicians Group clinics and to PI Attorneys who secretly agreed to refer their clients to ASK GARY is uniquely within the Defendants' possession at this time, and should be available through discovery.

11.    The Defendants acted in concert, with each needing the others to successfully carry out and profit from the scheme.

12.    The Defendants' scheme began in at least 2005 and has continued uninterrupted since that time.

13.    Based upon the Defendants' affirmative misrepresentations and acts of concealment, which are set forth below, State Farm did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this Complaint was filed.

14.    Pursuant to 28 U.S.C. § 2201, this action seeks a declaratory judgment that State Farm is not liable for any pending bills or bills submitted during the pendency of this action by the Defendants based upon the above-described conduct.   This action also asserts common law claims for fraud and unjust enrichment, as well as statutory claims under Fla. Stat. § 501.201 *et seq.* and Fla. Stat. § 456.053(5)(c) and (d), to recover actual damages of at least $480,000 in No-Fault Benefits paid pursuant to the fraudulent bills that the Defendants have submitted, or caused to be submitted, to State Farm.

## II. JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

16.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III. PARTIES

### A.     Plaintiffs

17.     State Farm Mutual Automobile Insurance Company is a corporation organized under the laws of Illinois, with its principal place of business in Illinois, and issues automobile insurance policies in Florida.

18.     State Farm Fire & Casualty Company is a corporation organized under the laws of Illinois, with its principal place of business in Illinois, and issues automobile insurance policies in Florida.

### B.     Defendants

19.     Gary Kompothecras is a citizen of Florida and resides in Siesta Key, Florida.  He is licensed to practice chiropractic medicine in Florida and owns Physicians Group, the "1-800-ASK-GARY" trademark, and the ASK GARY referral service. Kompothecras also secretly owns and/or controls WS Marketing, WS Media, and DB Medical Consulting.

20.     Physicians Group of Sarasota, LLC is a Florida corporation with its principal place of business at 4054 Sawyer Road, Sarasota, Florida 34233.   It was registered with the Secretary of State as "Physicians Group, LLC" in Florida between 2005 and 2010, but amended its name to "Physicians Group of Sarasota, LLC" in December 2010.   Physicians Group of Sarasota, LLC, is an active corporation for purposes of collecting accounts receivable; however, its operations were assumed by Physicians Group, LLC, a Delaware corporation (described directly below), as of November 29, 2010, when Physicians Group, LLC filed its Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida.   Its corporate headquarters also house the ASK GARY call center, WS Marketing, WS Media, DB Medical Consulting, as well as other companies owned and/or controlled by Kompothecras.

21.     Physicians Group, LLC is a Delaware corporation incorporated in 2010. This Delaware corporation also uses 4054 Sawyer Road, Sarasota, Florida 34233 as its corporate headquarters.   As of November 29, 2010, Physicians Group, LLC assumed operation of the Physicians Group medical clinics.   Its corporate headquarters also house the ASK GARY call center, WS Marketing, WS Media, and DB Medical Consulting, as well as other companies owned and/or controlled by Kompothecras.

22.     WS Marketing, Inc. is a Florida corporation and its principal place of business is 4054 Sawyer Road, Sarasota, Florida 34233 – also the corporate headquarters of Physicians Group.   It is purportedly owned on paper by Sigelakis.   In 2007, the Defendants formed WS Marketing to purportedly "own" and operate ASK GARY, rather

than Kompothecras.  This was done in furtherance of the fraud scheme to conceal Kompothecras' actual ownership and control of ASK GARY, which would have revealed the unlawful nature of the referrals from ASK GARY to the Physicians Group clinics. Sigelakis is a nominee owner of WS Marketing, and it is, in fact, secretly owned and/or controlled by Kompothecras.

23.     WS Media, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 4054 Sawyer Road, Sarasota, Florida 34233 – also the corporate headquarters of Physicians Group.  It is purportedly owned on paper by Sigelakis and was created to take over the operations of WS Marketing.  It began to transact business in Florida in 2011, and since then has purportedly operated the ASK GARY referral service by "leasing" the ASK GARY trademark and the corresponding phone number from Kompothecras.  As with WS Marketing, the Defendants created WS Media in furtherance of their fraud scheme to conceal Kompothecras' actual ownership and control of ASK GARY, which would have revealed the unlawful nature of the referrals from ASK GARY to the Physicians Group clinics.  Sigelakis is a nominee owner of WS Media, and it is, in fact, secretly owned and/or controlled by Kompothecras.

24.     William Sigelakis is a Florida citizen and resides in Sarasota, Florida. Sigelakis falsely purports to be the owner and president of WS Marketing and WS Media. In fact, Sigelakis is Kompothecras' cousin and is a nominee owner of WS Marketing and WS Media, whose only real role is to be a driver and delivery person for Kompothecras and Physicians Group.  He has never had any actual involvement in any of the operations

of either WS Marketing or WS Media, and has not possessed or exercised any indicia of true ownership or control.

25.     David Balot is a citizen of Florida and resides in Sarasota, Florida.  Balot works at 4054 Sawyer Road, Sarasota, Florida 34233 – also the corporate headquarters of Physicians Group.  He is the owner and president of DB Medical Consulting.  Balot has worked at the direction, and on behalf of, Kompothecras and his various companies since 1997.  Through DB Medical Consulting, Balot is responsible for managing the day-to-day operations of Physicians Group, the ASK GARY referral service, WS Media, WS Marketing, as well as other companies owned and controlled by Kompothecras.  Balot reports solely to Kompothecras and works at the direction, and on behalf, of Kompothecras.

26.     DB Medical Consulting is a corporation organized in 2001 under the laws of Florida, and its principal place of business is at 4054 Sawyer Road, Sarasota, Florida 34233 – also the corporate headquarters of Physicians Group.  Kompothecras pays Balot and DB Medical Consulting to manage the day-to-day operations of Physicians Group, the ASK GARY referral service, WS Media, WS Marketing, as well as other companies owned and/or controlled by Kompothecras, to ensure that ASK GARY refers unwitting callers to: (a) Physicians Group clinics, and not to other health care providers, and (b) PI Attorneys who pay ASK GARY for referrals, and at least in some instances, secretly agree to refer their clients to Physicians Group clinics.

## IV.  ALLEGATIONS COMMON TO ALL COUNTS

### A.    Insurance Benefits Under Florida Law

27.    With limited exceptions, patients involved in motor vehicle accidents seeking reimbursement for medically necessary expenses and wage losses are entitled to PIP Benefits from their own insurance companies up to a maximum of $10,000, regardless of fault.  Patients may also carry additional coverage in the form of MPC Benefits, which may cover amounts after PIP Benefits are exhausted.

28.    Physicians Group secures assignments of PIP and MPC benefits from State Farm insureds, and submits claims and charges directly to State Farm for services and treatments rendered to State Farm insureds.

### B.    Physicians Group's Claims And Charges To State Farm Are For Services And Treatments That Were Not Lawfully Rendered Because They Were Rendered Pursuant To Violations Of Civil, Criminal And Administrative Statutes And Rules Prohibiting Patient Brokering, Kickbacks, Self-Referrals, False, Deceptive And Misleading Advertising And Deceptive And Unfair Practices

29.    The claims and charges of Physicians Group that are described in the chart attached hereto as Exhibit 3 were for services and treatments that were not lawfully rendered because they were rendered pursuant to intentional violations of the civil, criminal and administrative statutes and rules relating to the provision of medical services and treatments, which are described herein.  These laws are designed to protect the public health, safety and welfare.  In recognition of their seriousness, the Florida Legislature has established substantial criminal, civil and administrative penalties for violations.

### 1.    Patient Brokering Act

30.    Florida's Patient Brokering Act broadly prohibits any person from offering, paying, soliciting, or receiving any commission, bonus, rebate, kickback or bribe, directly or indirectly, in cash or in kind, or engaging in any split-fee arrangement in any form whatsoever, to either induce the referral of patients or patronage from a health care provider or health care facility, or in return for referring the patients or patronage to a health care provider or health care facility.  Fla. Stat. §§ 817.505(1)(a) and (b).  It is also unlawful for any person to "aid, abet, advise, or otherwise participate" in such conduct.  Fla. Stat. § 817.505(1)(d).

31.    In enacting the Patient Brokering Act, the Florida Legislature created a limited exception permitting payments to a "health information service" that "provides information upon request and without charge to consumers about health care goods or services to enable consumers to select appropriate providers or facilities."  Fla. Stat. § 817.505(3)(i).  This exception applies, however, only if the health information service does not attempt "through its standard questions for solicitation of consumer criteria or through any other means to steer or lead a consumer to select or consider selection of a particular health care provider or health care facility."  Fla. Stat. § 817.505(3)(i)(1).  Even if ASK GARY were a "health information service," it would not satisfy this exception because it steered and led all consumers to select or consider selection of a particular health care provider, Physicians Group.

32.    As described below, Kompothecras and Physicians Group have violated Florida's Patient Brokering Act by offering and paying, directly or indirectly, in cash or

13

in kind, their co-defendants to induce the referral of patients or patronage to Physicians Group.  Similarly, the co-defendants have violated the Patient Brokering Act by soliciting and receiving, directly or indirectly, in cash or in kind, payments from Kompothecras and Physicians Group in return for referring patients or patronage strictly to Physicians Group.  All Defendants have also violated the Patient Brokering Act to the extent that they have solicited or received, directly or indirectly, from PI Attorneys referrals of patients or patronage to Physicians Group in exchange for client referrals from ASK GARY to the PI Attorneys.  All Defendants have also violated the Patient Brokering Act by aiding, abetting, advising and otherwise participating in such conduct.

### 2.     Anti-Kickback Statute

33.     Florida's Anti-Kickback Statute prohibits any health care provider or any provider of health care services from offering, paying, soliciting, or receiving "a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients."  Fla. Stat. § 456.054.  The Anti-Kickback Statute provides a broad definition of "kickback" to include any "remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items . . . ."  Violations of the Anti-Kickback Statute are also violations of the Patient Brokering Act.  Fla. Stat. § 456.054(3).

34.     As described below, Kompothecras and Physicians Group have violated the Anti-Kickback Statute by offering and paying kickbacks, directly or indirectly, overtly or covertly, in cash or in kind, to their co-defendants as an incentive or inducement to refer patients strictly to Physicians Group for future services.

Kompothecras and Physicians Group have also violated the Anti-Kickback Statute to the extent that they have offered or arranged to refer clients to PI Attorneys as an incentive or inducement for the PI Attorneys to refer clients to Physicians Group.  All violations of the Anti-Kickback Statute are violations of the Patient Brokering Act.

### 3.  Patient Self-Referral Act

35.   Florida's Patient Self-Referral Act prohibits health care providers from referring patients for designated health care services to any entity in which the health care provider is an investor or has an investment interest, subject to various exceptions that do not apply here.  Fla. Stat. § 456.053(5).  Under Florida's Patient Self-Referral Act, health care providers include chiropractors, such as Kompothecras, and designated health care services include the physical therapy and rehabilitative services purportedly rendered by Physicians Group in connection with the claims and charges at issue.  Fla. Stat. § 456.053(3)(c) and (i).

36.   The legislative intent expressed in the Patient Self-Referral Act recognizes "that the referral of a patient by a health care provider to a provider of health care services in which the referring health care provider has an investment interest represents a potential conflict of interest.  The Legislature finds these referral practices may limit or eliminate competitive alternatives in the health care services market, may result in overutilization of health care services, may increase costs to the health care system, and may adversely affect the quality of health care.  The Legislature also recognizes, however, that it may be appropriate for providers to own entities providing health care services, and to refer patients to such entities, as long as certain safeguards [not satisfied

here] are present in the arrangement.  It is the intent of the Legislature to provide guidance to health care providers regarding prohibited patient referrals between health care providers and entities providing health care services and to protect the people of Florida from unnecessary and costly health care expenditures." Fla. Stat. § 456.053(2).

37.    The Patient Self-Referral Act prohibits health care providers from submitting any claim for payment to any entity, including third-party payors, for services rendered pursuant to an unlawful self-referral.  Fla. Stat. § 456.053(5)(c).  Moreover, a provider that collects any amount billed for services that were the product of an unlawful self-referral must "refund such amount on a timely basis." Fla. Stat. § 456.053(5)(d).

38.    As described below, Kompothecras, who is a health care provider, has violated the Patient Self-Referral Act by referring patients who are solicited through the ASK GARY referral service to receive designated health care services at Physicians Group, which is an entity in which Kompothecras is an investor and has an investment interest.  Physicians Group and Kompothecras have violated the Patient Self-Referral Act by submitting bills to State Farm for services rendered by Physicians Group pursuant to Kompothecras' unlawful self-referrals and by failing to refund any of the amounts collected by Physicians Group from State Farm for designated health services rendered pursuant to the unlawful self-referrals.

### 4.    False, Misleading and Deceptive Advertising By Kompothecras

39.    The Florida Legislature has established grounds for disciplinary action against chiropractors, including false, deceptive or misleading advertising, advertising under a name other than one's own, and soliciting patients, either personally or through

an agent, unless such solicitation falls into a category of solicitations approved by the Florida Board of Chiropractic Medicine ("Chiropractic Board"). Fla. Stat. § 460.413(d), (f) and (l).

40.     The Chiropractic Board has adopted rules prohibiting fraudulent, false, deceptive and misleading advertising by chiropractors, such as Kompothecras.  F.A.C. Rule 64B2-15.001.  In adopting these rules, the Chiropractic Board has stated that "[i]t is the policy of the Board that advertising by licensed [chiropractors] should be regulated so as to effectuate the duty of the State of Florida to protect the health, safety and welfare of its residents, while not abridging any rights guaranteed to such practitioners or to the public. . . .  To that end, the Board permits the dissemination to the public of legitimate information, in accordance with the Board's rules, regarding . . . where and from whom chiropractic services may be obtained, so long as such information is in no way fraudulent, false, deceptive, or misleading." F.A.C. Rule 64B2-15.001(1).

41.     Under the rules adopted by the Chiropractic Board, "[n]o chiropractor shall disseminate or cause the dissemination of any advertisement or advertising which is in any way fraudulent, false, deceptive or misleading.  Any advertisement or advertising shall be deemed by the Board to be fraudulent, false, deceptive, or misleading if it: contains a misrepresentation of facts." F.A.C. Rule 64B2-15.001(2)(a).

42.     Furthermore, under the rules adopted by the Chiropractic Board ". . . it is misleading and deceptive for a chiropractor or a group of chiropractors to advertise a chiropractic referral service or bureau unless the advertisement specifically names each of the individual chiropractors who are participating in the referral service or bureau.

Referral services that operate on a national or statewide basis, and that have at least 50 participating members, do not have to specifically name each individual chiropractor participating in the service on their advertisements.  Any advertisement generated by or on behalf of a chiropractor must disclose that it is generated by or on behalf of a chiropractor by including a reference to the chiropractor by name and degree."  F.A.C. Rule 64B2-15.001(2)(b).

43.     Kompothecras, who is a chiropractor, has violated the statute and related rules prohibiting chiropractors from fraudulent, false, deceptive and misleading advertising, advertising under a name other than one's own, and soliciting patients, either personally or through an agent, unless such solicitation falls into a category of solicitations approved by the Chiropractic Board.  Specifically, Kompothecras has acted in concert with his co-defendants to engage in fraudulent, false, deceptive and misleading advertising through ASK GARY by: (a) misrepresenting material facts, namely by advertising ASK GARY as an independent, legitimate medical and legal referral service, and omitting that it is, in fact, secretly owned and controlled by Kompothecras to steer patients only to Physicians Group and to PI Attorneys who pay ASK GARY for referrals and, at least in some instances, secretly agree to refer their clients to Physicians Group, and (b) advertising under a name, ASK GARY, other than Kompothecras or Physicians Group.  Fla. Stat. §§ 460.413(d) and (f) and F.A.C. Rule 64B2-15.001(1) and (2)(a).

44.     Kompothecras also has engaged in fraudulent, false, deceptive and misleading advertising by acting through agents, namely ASK GARY and his co-defendants, to solicit patients through a chiropractic referral service or bureau, ASK

18

GARY, without identifying that ASK GARY's advertisements are, in fact, generated by and on behalf of only Kompothecras and Physicians Group.  Fla. Stat. § 460.413 (l) and F.A.C. Rule 64B2-15.001(1), (2)(a) and (2)(b).

### 5.    Deceptive and Unfair Trade Practices Act

45.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts and practices in the conduct of any trade or commerce.  Fla. Stat. § 501.202(2)

46.    Violations of any law, statute, rule, or regulation which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices constitute violations of FDUTPA.  Fla. Stat. § 501.203(3)(c).

47.    An act is unfair under FDUTPA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  *See Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006).  A deceptive act or practice under FDUTPA is a representation, omission, or other act or practice that is likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment.  *See PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So. 2d 773, 777 (Fla. 2003).

48.    The Defendants have violated FDUTPA by engaging in the unfair and deceptive acts and practices described in Paragraphs 49-120 below, which violate the

established public policies of the State of Florida as codified in the Patient Brokering Act, the Anti-Kickback Statute, the Patient Self-Referral Act, and the laws and regulations prohibiting fraudulent, false, deceptive and misleading advertising by chiropractors, and which are immoral, unethical, oppressive, unscrupulous, misleading and substantially injurious to consumers.

### C.    Defendants' Unlawful And Fraudulent Scheme

#### 1.    Kompothecras Launches the ASK GARY "Referral" Service

49.    In 1996 Kompothecras began amassing a network of clinics throughout Florida, which now consists of more than 25 Physicians Group clinics.  The Physicians Group clinics have built their business model and fueled their growth by providing therapy and rehabilitative services to people who have been in motor vehicle accidents for which they are not at fault, and who have claims for No-Fault Benefits as well as BI/UM.  The Physicians Group clinics do not accept any other private or public insurance.  As described herein, the Defendants' fraudulent business model targets the quick exhaustion of No-Fault Benefits through the delivery of unlawful services to unwitting patients procured through the ASK GARY referral center.

50.    The phenomenal success and growth of the Physicians Group clinic network in Florida has been spurred in large part through the creation and aggressive marketing of the ASK GARY referral service to unwitting motor vehicle accident victims as a legitimate and independent medical and lawyer referral service, which of course it is not.

51.    In 2005, Kompothecras initially registered "1-800-ASK-GARY" with the

United States Patent and Trademark Office and launched the ASK GARY referral service.

52.     Since its inception, Kompothecras and his co-defendants have advertised ASK GARY as a "trusted" independent medical and legal referral service.  For example, the ASK GARY website has informed motor vehicle accident victims to: "Seek out additional help from a trusted source.  When you find yourself in need, call 1-800-ASK-GARY for the kind of support you need and deserve."  It noted that "[i]t's important to know when to ask for help, and when to reach out to the trained professionals at a service like 1-800-ASK-GARY."  The ASK GARY website has also included tutorials on what accident victims should do following an accident, through such pages as "Have You Been Injured In An Auto Accident" and "Things You Need To Do After A Car Crash."  These pages have encouraged accident victims to seek medical treatment "[e]ven if you don't think you've been injured immediately after the auto accident, while still at the scene, symptoms can appear hours or even days later.  See a doctor right away to get checked out.  Some internal injuries might not have any symptoms at all, but might be fatal in a few hours or days.  Seeking medical attention after the auto accident could be the most important step you take."  *See* Ex. 4.

53.     In fact, ASK GARY has never been an independent or legitimate referral service and the public has had no reason to trust it as such, because it was created by Kompothecras and has been used by him and his co-defendants to steer patients to Physicians Group clinics and PI Attorneys who pay ASK GARY for client referrals and, at least in some instances, secretly agree to refer their clients to Physicians Group.

21

Indeed, the ASK GARY "call center" operates from the corporate office space of Physicians Group itself, so that callers dialing ASK GARY are speaking to operators located within Physicians Group's corporate office.   Moreover, the ASK GARY operators are required to transfer callers directly to the Physicians Group's scheduling personnel so immediate appointments can be made for them at a Physicians Group clinic.

54.     Until in or about 2007, the ASK GARY website included a "disclaimer" link that was buried at the bottom of the homepage.  If anyone took the affirmative step to click the "disclaimer" link, they would have been linked to a page stating that "ASK GARY comprise[s] a part of the marketing arm of 1st Health, Inc. in compliance with Florida Statutes," and cited various Florida statutes, including the Patient Brokering Act. The "disclaimer" went on to "disclose" that "help line personnel may suggest that some or all callers contact entities in which the owner . . . or entities otherwise affiliated with or through ASK GARY have a financial interest, including but not limited to 1st Health, Inc." *See* Ex. 5.

55.     1st Health, Inc. was the name of Kompothecras' Florida clinics in 2005 when Kompothecras registered the ASK GARY trademark.   Shortly thereafter, in late 2005, Kompothecras changed the clinics' name to Physicians Group.   Thereafter, the ASK GARY website continued to use the buried "disclaimer," but replaced "1st Health, Inc." with "Physicians Group, LLC," and noted that ASK GARY "markets" for Physicians Group. *See* Ex. 6.

56.     The above-described "disclaimer" that existed on the ASK GARY website until 2007 did not cure the violation of the patient brokering, kickback, self-referral,

FDUTPA or fraudulent, false, deceptive and misleading advertising laws for several reasons. First, the financial and referral arrangements between Kompothecras and Physicians Group on the one hand, and ASK GARY on the other, violated those laws. Second, the "disclaimer" did not create or fall within any exception or safe harbor to these laws. Third, the "disclaimer" itself was still fraudulent, false, deceptive and misleading because it deliberately misrepresented that help line personnel "may suggest that some or all callers contact entities in which the owner . . . or entities otherwise affiliated with or though ASK GARY have a financial interest, including but not limited to [Physicians Group]." In fact, ASK GARY's help line personnel were physically located at Physicians Group's corporate offices and their policy and practice was to schedule all callers for appointments at Physicians Group.

57.    In or about the spring of 2007, the above-described "disclaimer" was removed from ASK GARY's website, and the Defendants set into motion an elaborate scheme to create the appearance that ASK GARY was a legitimate medical and legal referral service by creating shell companies with nominee owners, other than Kompothecras, to purportedly own and operate ASK GARY. The Defendants did this intentionally to foster the illusion that Kompothecras and Physicians Group were independent from ASK GARY. As discussed next, the timing of the Defendants' actions in 2007 corresponded with an investigation by the Florida Bar of PI Attorneys who were participating in the ASK GARY legal referral service.

## 2.     Kompothecras Creates WS Marketing to Disguise His Ownership and Control of ASK GARY

58.     In 2007, the Florida Bar investigated and cited several lawyers who participated in the ASK GARY referral service, finding that the lawyers obtained clients through advertising that improperly used testimonials and dramatizations.

59.     In 2007, at about the same time as the Florida Bar's investigation of ASK GARY, Kompothecras recruited Sigelakis to create and act as the nominee owner of WS Marketing.   *See* Ex. 7.   Shortly thereafter, on July 26, 2007, Sigelakis filed an Application for Registration of the Fictitious Name with the Florida Secretary of State, identifying himself as the "Owner" of WS Marketing and WS Marketing as the "owner" of the fictitious ASK GARY name.   *See* Ex. 8.   These actions were taken to further the fraud by creating the illusion that ASK GARY was independent from Kompothecras and Physicians Group.

60.     WS Marketing was a shell company that never, in fact, owned the fictitious ASK GARY name, and Sigelakis was a nominee owner.   In addition to being Kompothecras' cousin, Sigelakis' only true roles have been to act as a driver and delivery person for Kompothecras and Physicians Group.

61.     Balot has testified that Kompothecras "gave away" ASK GARY to Sigelakis, confirming that WS Marketing and Sigelakis provided no consideration to acquire the ASK GARY name.

62.     After the purported transfer of the ASK GARY name to WS Marketing, nothing, in fact, changed.   Sigelakis continued to provide driving and delivery services to Kompothecras and Physicians Group.   The ASK GARY call center continued to operate

from the same location that it did before the purported transfer to WS Marketing – the Physicians Group's corporate headquarters.  David Balot, acting through DB Medical Consulting, continued to manage the daily operations of ASK GARY from Physicians Group's corporate headquarters, just as he had before the purported transfer to WS Marketing, and continued to ensure that callers were referred to Physicians Group and PI Attorneys who paid ASK GARY for referrals and, at least in some instances, secretly agreed to refer their clients to Physicians Group.  In that role, Balot's responsibilities have included hiring, supervising and firing employees, implementing policies and procedures established by Kompothecras, and determining, in consultation with Kompothecras, the criteria and selection for which PI Attorneys are included in the ASK GARY referral network, and under what terms including, at least in some instances, a requirement that the PI Attorneys secretly agree to refer their clients to Physicians Group. From the inception of the scheme through the present, Balot has been Kompothecras' right-hand-man, overseeing the operations of ASK GARY and Physicians Group, coordinating ASK GARY's unlawful advertising and referral scheme for the benefit of Kompothecras, Physicians Group and PI Attorneys, and reporting directly and solely to Kompothecras.

63.    Balot has testified that, from the same Physicians Group's corporate headquarters where he worked and the ASK GARY call center is located, he also managed the activities of WS Marketing.  In fact, Sigelakis – the purported owner of WS Marketing – has never even had office space at Physicians Group's corporate

headquarters.   Indeed, Balot has testified that Sigelakis knows "nothing" about WS Marketing's business.

64.     In contrast, Kompothecras and Physicians Group provide Balot and DB Medical Consulting free office space at Physicians Group's corporate headquarters, as well as a free administrative assistant (paid by Kompothecras), a free computer and all other technical and support services.

65.     To facilitate the fiction that neither he nor Physicians Group owned or controlled the ASK GARY referral service, Kompothecras also arranged to have Physicians Group make payments to WS Marketing, purportedly to be part of the ASK GARY referral "network" and for "advertising services."   In fact, these payments were designed to further the fraud by fostering the illusion that WS Marketing actually was independent from Kompothecras and Physicians Group and owned the ASK GARY name, when in fact WS Marketing was not independent and did not own the ASK GARY name.   In reality, WS Marketing was a shell company and provided no actual goods or services to Physicians Group or Kompothecras.   Furthermore, any money that was paid to Sigelakis was intended to compensate him for his participation in the fraud scheme by, among other things, acting as the nominee owner of WS Marketing.

66.     Similarly, to further facilitate the fiction that neither he nor Physicians Group owned or controlled the ASK GARY referral service, Kompothecras arranged for Physicians Group to make payments to Balot and DB Medical Consulting purportedly as independent contractors.   In fact, Balot and DB Medical Consulting were not independent from Kompothecras.   Instead, they worked for and under the direction of Kompothecras

and their responsibility was to run the ASK GARY referral service in a manner that ensured that all callers were referred to Physicians Group, and PI Attorneys who paid ASK GARY for client referrals and, at least in some instances, secretly agreed to refer their clients to Physicians Group.

67.     The payments from Physicians Group to WS Marketing, Balot and DB Medical Consulting, along with the provision of free office, administrative staff, and other items and services of value to Balot and DB Medical Consulting, were unlawful payments to induce continued exclusive referrals from ASK GARY to Physicians Group and to PI Attorneys who paid ASK GARY for client referrals and, at least in some instances, secretly agreed to refer their clients to Physicians Group.

68.     As described below, in April 2011, Kompothecras – *not* WS Marketing or Sigelakis – filed papers with the Florida Secretary of State cancelling the ownership and registration of the fictitious name ASK GARY, which had been registered to WS Marketing in July 2007.  *See* Exs. 9, 10.   Thus, Kompothecras himself unilaterally "cancelled" WS Marketing's purported ownership of the ASK GARY name, even though WS Marketing was allegedly an independent company owned by Sigelakis unrelated to Kompothecras and Physicians Group.  This 2011 Kompothecras filing reveals the fiction that WS Marketing was anything other than a shell company and Sigelakis was its nominee owner.

    **3.**    **Defendants Create A Fraudulent "Marketing Notice" To Further Deceive And Mislead Patients**

69.    In or about 2007, at or about the same time WS Marketing was created, Physicians Group began asking patients who were referred through the ASK GARY referral service to sign a "Standard Marketing Notice" ("Notice").  *See* Ex. 11.

70.    The Notice is also fraudulent, false, deceptive and misleading.   For example:

- It states "W.S. Marketing, Inc. is an advertising company, whose advertising includes . . . using the 1-800-ASK-GARY telephone number for the ASK GARY Referral Service," but, as described above, WS Marketing was in fact not an advertising company; it was a shell company created to foster the illusion that it was independent from Kompothecras and Physicians Group and that it owned the ASK GARY name.

- It states "ASK GARY is also a medical referral service that charges a fee to any qualified health care provider on its referral panel," but ASK GARY was not a legitimate medical referral service and it did not have a "referral panel" of qualified health care providers; it was secretly owned and controlled by Kompothecras and it existed to refer all callers to Physicians Group.

- It states "[t]here is no common ownership among Physicians Group, LLC, W.S. Marketing, the attorneys on the referral panel or any of their respective employees, shareholders, officers, directors, affiliates or subsidiaries," but in fact Physicians Group and WS Marketing were both actually owned and controlled by Kompothecras.

    **4.**    **ASK GARY Changes Its Advertising to Further Disguise Kompothecras' Ownership and Control And Its True Referral Relationship With Physicians Group**

71.    Having created WS Marketing – a shell corporation that purportedly "owned" the ASK GARY name – and having installed Sigelakis as a nominee owner of WS Marketing, additional changes were made to the ASK GARY website to further conceal the true relationship between Physicians Group and ASK GARY.  Specifically,

in the summer of 2007, the buried "disclaimer" that stated that ASK GARY "marketed for" Physicians Group was deleted, and the ASK GARY website was changed to omit any mention of Physicians Group.

72. The ASK GARY website, however, continued to advertise ASK GARY as though it were a legitimate, independent medical and legal referral service. For example, ASK GARY continued to advertise itself as a referral service that uniquely tailored its referrals to patients' unique needs. For instance, it touted: "As a free helpline referral service, we are here to connect you with injury attorneys, doctors, and chiropractors who are uniquely suited to your situation," "1-800-ASK-GARY (1-800-275-4279) has helped thousands of accident victims find the right car accident lawyer and the best possible medical care," and "[w]hen you call 1-800-ASK-GARY (1-800-275-4279), you will be greeted by a caring helpmate who works for you, not a lawyer. As you tell us about your accident and concerns, we will help you find a lawyer and doctors based on your personal situation, needs, and preferences so that you can start putting the pieces of your life back together." *See* Ex. 12 at p. 1-2. Of course, none of this was true and none of it was done. Instead, ASK GARY steered all callers to Physicians Group and PI Attorneys who paid for referrals and, at least in some instances, secretly agreed to refer clients to Physicians Group, to serve the needs of the Defendants and PI Attorneys, not the patients' personal situations, needs, or preferences.

73. ASK GARY also continued to prey on callers' potential fears by imploring them to seek treatment under any circumstances: "If you have been in a car accident, you need help now. You need a doctor to help you heal from your injuries . . . .

Even if there is no apparent emergency or visible injury after your car accident, you should never do nothing at all.  The risk is too great.  You need to take action, and our accident helpline is a free way to do just that.  To receive the legal and medical referral assistance you need now, call 1-800-ASK-GARY." *See* Ex. 12 at p.4.

74.     ASK GARY also falsely represented that the "1-800-ASK-GARY network includes hundreds of experienced injury attorneys and medical professionals." *See* Ex. 12 at p.1.  This representation was false because the ASK GARY network did not contain "hundreds" of medical professionals, and in fact they have not identified any medical professional other than Kompothecras' own Physicians Group clinics to whom referrals were made.

75.     ASK GARY also continued to advertise itself as a "trusted resource" that would search through "countless medical providers" to find "the right medical professionals" for prospective patients' needs:  "Healing your injuries and getting you back to what your life was like before the accident should be your primary concerns – not worrying about searching through countless medical providers and trying to find the right one.  Leave the hard work to 1-800-ASK-GARY."  ASK GARY, of course, did no such "searching through countless medical providers," and instead merely funneled callers to the nearest Physicians Group clinics.  *See* Ex. 13.

76.     ASK GARY's website remained essentially unchanged from 2007 until 2011, when, as described below, additional unwanted scrutiny by the Florida Bar led to further fraudulent acts.

### 5. Kompothecras and Sigelakis Form WS Media to Continue To Disguise Kompothecras' Ownership of ASK GARY

77. In January 2011, the Florida Bar formed a Special Committee on Lawyer Referral Services ("Special Committee") in response to "numerous complaints regarding advertising by lawyer referral services in Florida" and "[i]n the midst of explosive increases in advertising by for-profit lawyer referral services – many directed at victims of motor vehicle accidents covered by Florida's no-fault insurance law which provides attractive personal injury protection benefits." The Bar's Special Committee noted the "increase in public concerns over the potential harm from these entities and the misleading nature of their activities." *See* Ex. 2 at p. 1.

78. Noting that the "creative design of these [lawyer referral] services and the significant involvement of non-lawyers have posed particular regulatory challenges for the Florida Bar," the Bar's Special Committee was tasked to review current practices of these services and to consider whether and to what extent the Florida Bar could directly regulate lawyer referral services. *See* Ex. 2 at p. 1.

79. ASK GARY was the subject of extensive discussion in the Bar's Special Committee's 2012 report. To illustrate, the report states: ". . . most for-profit referral services are owned by persons or entities other than lawyers, particularly in the area of personal injury referral services. Non-lawyer owned entities are not subject to the Rules Regulating The Florida Bar. For example, 1-800 ASK-GARY ("ASK GARY"), one of the more heavily advertised and utilized referral services, operating extensively throughout Florida, is apparently a trade name, the ownership of which can ultimately be traced to Dr. Gary Kompothecras, D.C., a chiropractor in Sarasota. Entities owned or

controlled by Kompothecras also own or control a chain of clinics operating throughout Florida and in at least two other states.  Callers to the ASK GARY hotline are referred exclusively to the Kompothecras-controlled clinics.  Although the referral service itself is not subject to the jurisdiction of the Florida Bar, approximately 76 members of The Florida Bar were listed as participating members of ASK GARY as of June 2012." *See* Ex. 2 at p. 17.

80.    The Bar's Special Committee's 2012 report described the experience of a Kentucky woman ("the Kentucky Victim") who, following a serious auto accident, directly contacted a Kentucky law firm based on the law firm's advertising.  *See* Ex. 2 at pp. 19-20.  The Kentucky Victim did not call ASK GARY or any other referral service. *Id.* at p. 20.  Nevertheless, according to the Bar's Special Committee's report, the law firm that the Kentucky Victim contacted had significant involvement with ASK GARY, was headquartered in Florida and maintained law offices in both Kentucky and Florida. *Id.* at p. 19.  Although the law firm is not named in the Special Committee's report, the description appears to squarely fit Winters & Yonker, the firm for which attorney Anthony Gadlage worked and which, according to Gadlage, had an unlawful *quid pro quo* cross-referral relationship pursuant to which the firm agreed to refer clients to Kompothecras-owned clinics in return for client referrals from ASK GARY.  *See* Ex. 1.

81.    Furthermore, the experience described by the Kentucky Victim to the Bar's Special Committee fully corroborates Attorney Anthony Gadlage's attached affidavit describing the unlawful cross-referral relationship between Winters & Yonker, ASK GARY and the Kompothecras-owned clinics in both Kentucky and Florida, and

illustrates the potential harms to the public that flow from these unlawful arrangements. Specifically, the Kentucky Victim explained that her law firm advised her to use her PIP Benefits for treatment, and never advised her that her health insurance was potentially available to cover her medical costs. *See* Ex. 2 at p. 20. Based upon the law firm's advice, the Kentucky Victim was seen by doctors affiliated with a clinic owned by ASK GARY and eventually flown to Florida for surgery at another clinic affiliated with ASK GARY. *Id.* The Kentucky Victim was advised that the treatment she needed was not available in Kentucky and would need to be performed in Florida. *Id.* Ultimately, through her health insurance, the Kentucky Victim was seen by other doctors and advised that the treatment she had received in Florida at the clinic affiliated with ASK GARY was unnecessary and may have exacerbated her condition. *Id.* Yet, a significant portion of her ultimate settlement was paid to the Florida clinic affiliated with ASK GARY. *Id.*

82. The description of the Kentucky Victim's experiences is consistent with the allegations of a verified complaint filed by Sharon Langford in *Langford v. Winters Yonker & Rousselle, P.S.C. et al.*, No. 10 CI 00518, in Jefferson Circuit Court. *See* Ex. 14. The experience of Langford and others was also described in a November 10, 2011, Bloomberg News article, which corroborates the attached affidavit of Attorney Gadlage regarding the improper cross-referral relationship between Kompothecras and Winters & Yonker, in which Kompothecras conditioned referrals from the ASK GARY hotline to Winters & Yonker on that law firm's secret agreement to refer its clients to Kompothecras' clinics in Kentucky and Florida. *See* Ex. 15.

83.     Kathleen Weston Smith has confirmed that she had a similar experience. *See* Ex. 16.   In 2009 Smith was rear-ended and injured in an accident in Clearwater, Florida along with her husband who was a passenger in the vehicle.   *Id.* at ¶ 3.   She called ASK GARY and asked for both a referral to a medical provider who would treat her even though she did not have health insurance as well as a lawyer who would pursue their case.   *Id.* at ¶ 6.   ASK GARY referred her to Physicians Group which immediately started her on a regimen of treatment consisting of physical therapy, massage, traction and chiropractic services which were to begin immediately three times a week indefinitely. *Id.* at ¶¶ 9 ,13.   Smith was told that insurance would take care of all medical bills.   *Id.* at ¶ 8. It was never explained to Smith, either by Physicians Group or the lawyer who ASK GARY referred Smith to, that Physicians Group and ASK GARY were owned by Kompothecras.   The treatment regimen was the same for both Smith and her Husband despite the fact that her Husband was complaining of a knee injury – an area of Smith's body which was not injured.   *Id.* at ¶ 11.

84.     During the course of her treatment, Smith told staff at Physicians Group that she  did not feel she needed all of the services and that specifically, she did not want to receive traction or electro-stimulation.   However, Physicians Group and the law office instructed her to continue with all forms of treatment provided at Physicians Group because "this is what you have to do".   *Id.* at ¶¶ 13,19.

85.     By January, 2010, Smith became concerned about the cost of these treatments and, upon her inquiry, was informed that the cost of the services rendered by Physicians Group totaled approximately $10,000.   *Id.* at ¶ 14.   By March 2010, Smith

still had not been seen by a surgeon or pain management doctor. Nonetheless, a Physician Group doctor told Smith that she could only receive treatment at Physicians Group once a month despite the fact that Smith felt that she was getting relief from the massage therapy, physical therapy and chiropractic services. *Id.* at ¶ 21.

86. When Smith complained, she was allowed to see two other Physician Group doctors, but when those doctors recommended certain follow up treatments, which Smith found to be effective, she was told that Physicians Group would not schedule those services because they had not received sufficient payments on her account, which by this time, totaled approximately $25,000. *Id.* at ¶¶ 21 – 25. And, for the first time, she was told that the MRI which was taken in January 2010 showed damage to her disks in her lower back – information which had not been previously provided to Smith during her Physicians Group treatment. *Id.* at ¶ 23. And, when some of these treatments were rendered because Smith complained, she was told that they must be followed by chiropractic care at Physicians Group which Smith felt was unnecessary. *Id.* at ¶ 26.

87. Smith felt duped because she had been forced to receive unnecessary treatments by Physicians Group and Physicians Group did not ensure that she received the treatment that she needed and would be most effective. *Id.* at ¶ 22. Further, after Smith fired the lawyer referred by ASK GARY and hired replacement counsel and her case was settled, Smith discovered that because she was a U.S. Air Force veteran, she could have received treatment at the Veterans Administration at no charge as her benefits for serving in the U.S. Armed Forces. *Id.* at ¶ 15. Neither Physicians Group nor the lawyer which it referred to Smith ever advised her of this valuable benefit. *Id.*

88.     The Bar's Special Committee also heard from a chiropractor and MRI technician who formerly worked for Physicians Group clinics.  *See* Ex. 2 at p. 22. Among other things, he indicated that "all auto accident victim calls to ASK GARY are referred to Physicians Group clinics" and "Physicians Group allowed lawyers and corporate financial personnel to influence decisions regarding the levels of health care provided to individuals, maintained a 'public' and 'non-public' set of records on each patient, based financial incentives for physicians on the number of procedures they performed, and engaged in other questionable practices that he did not consider to be in the best interests of its patients."  *Id.*  According to the Bar's Special Committee's report, the day after this former employee appeared at the public hearing on these matters, he received a cease and desist letter from ASK GARY's legal counsel demanding he stop making "false and defamatory statements" about the company's "billing practices, bonus structure and patient care" and threatening to sue him.  *Id.*  As described in the next paragraph, that threat became a reality.

89.     On January 11, 2012, Physicians Group and WS Media sued the chiropractor who formerly worked for Physicians Group and a co-defendant, accusing the chiropractor, among other things, of stealing confidential proprietary and patient information from Physicians Group and attempting to extort money from Physicians Group in return for not providing the stolen information to the media and making false allegations.  The complaint seeks damages and injunctive relief, and is pending.

90.     The Bar's Special Committee's report also noted that Florida's Chief Financial Officer Jeff Atwater corresponded with the then Florida Bar President

"encouraging the Bar to implement rules banning lawyer participation in for-profit referral services because of the prevalence of fraud in the personal injury protection arena and the role of clinics affiliated with such referral services in the escalating PIP crisis." *Id.* at 23.

91.     As a result of its investigation, the Bar's Special Committee made several recommendations, and first among them was to prohibit lawyers from accepting client referrals from any person, entity or service that also refers or attempts to refer clients to any other type of professional service for the same incident, transaction or circumstance, and from referring a client to any other professional service in consideration of the lawyer's receipt of referrals from any lawyer referral service.   *Id.* at 26.   This recommendation, of course, would strike at the heart of the Defendants' ASK GARY business model.

92.     Not coincidentally, in early February 2011, one month after the Bar's Special Committee was created to investigate lawyer referral services, with a particular focus on for-profit services that are not owned by lawyers, such as ASK GARY, Sigelakis formed a new company, WS Media, which purported to replace WS Marketing as the owner and operator of ASK GARY.   Sigelakis identified himself as WS Media's purported "Chairman and President."   *See* Ex. 17.   In fact, WS Media was a shell company, Sigelakis was a nominee owner of the company, and it was secretly owned and controlled by Kompothecras.   WS Media was formed to continue the charade that Kompothecras did not actually own and control ASK GARY, when in fact he did.

93.     On April 19, 2011, Kompothecras signed and filed paperwork with the Florida Secretary of State cancelling WS Marketing's purported ownership of the ASK GARY name.   *See* Ex. 9.   By this unilateral act, Kompothecras proved that WS Marketing was a shell company, that Sigelakis was a nominee owner of the company, that the company was secretly owned and controlled by Kompothecras, and that Kompothecras maintained actual ownership and control of ASK GARY during the entire time that WS Marketing purported to own and control it from 2007 through 2011. Otherwise, there would have been no apparent basis upon which Kompothecras would have had the authority to unilaterally cancel WS Marketing's purported ownership of the ASK GARY name.

94.     Also on April 19, 2011, Kompothecras filed a new application for registration of the ASK GARY fictitious name with the Florida Secretary of State on behalf of WS Media, representing that *he* was the "new" owner of the ASK GARY fictitious name and was leasing it to WS Media.   *See* Ex. 10.   The "lease" of the ASK GARY name to WS Media was a sham, and was done by the Defendants to continue the charade that Kompothecras did not actually own and control the ASK GARY referral service, when in fact he did.

95.     Despite the creation of WS Media and its purported "lease" of the ASK GARY fictitious name, nothing else changed.   The address for WS Media was the Physicians Group's corporate headquarters, which was the same address for WS Marketing.   Sigelakis served as the nominee owner of both WS Media and WS Marketing, but had no involvement in the actual operations of the ASK GARY referral

service.  During the entire period that the ASK GARY referral service was purportedly owned or leased by WS Marketing and WS Media, the call center remained in the same place – the Physicians Group corporate headquarters – and David Balot, through DB Medical Consulting, continued to oversee and supervise all of its operations.

96.     As was the case with WS Marketing, Kompothecras and Physicians Group have continued to make payments to WS Media, as well as provide payments and free office space, administrative staff, and other items and services of value to Balot and DB Medical Consulting to induce continued referrals from the ASK GARY referral service to Physicians Group and/or to PI Attorneys who have paid a fee to ASK GARY and, at least in some instances, have secretly agreed to refer their clients to the Physicians Group clinics.  These payments, like those made to WS Marketing, are designed to create the illusion that Physicians Group and WS Media are truly independent entities, and that ASK GARY was a lawful referral service, when, in fact, Physicians Group and WS Media are not independent entities and ASK GARY is not a lawful referral service because it steers all callers to Physicians Group clinics and/or PI Attorneys who pay a fee to ASK GARY and, at least in some instances, have secretly agreed to refer their clients to the Physicians Group clinics.

97.     Despite the creation of WS Media, and Kompothecras' purported "lease" of the ASK GARY trademark to that entity, the Bar's Special Committee concluded in 2012 that "ownership of [ASK GARY] can ultimately be traced to Dr. Gary Kompothecras, D.C." and that "[c]allers to the ASK GARY hotline are referred exclusively to the Kompothecras-controlled clinics."  *See* Ex. 2 at p. 17.

98.     Faced with increased media scrutiny and the investigation by the Bar's Special Committee, ASK GARY again changed its website and inserted a new "Florida Disclaimer," stating:

> 1-800-ASK GARY may refer patients for medical care to Joint Commission Accredited (JCA) facilities on its panel which are convenient to the patient, such as Physicians Group, LLC; if there is no such JCA facility on its panel convenient to the patient, 1-800-ASK GARY may defer to attorneys that may help find medical care providers which are convenient for the patient.  Physicians Group LLC has paid a fee to participate in the Ask Gary referral service.  *See* Ex. 18.

99.     This "disclaimer" was fraudulent, false, deceptive and misleading because it represents that: (1) "ASK GARY may refer patients for medical care to Joint Commission Accredited (JCA) facilities on its panel," when it in fact does not have a true medical referral "panel," and is not a legitimate referral service, but rather refers exclusively to Physicians Group; (2) "ASK GARY may defer to attorneys who may help find medical care providers which are convenient for the patient," when in fact ASK GARY accords no true deference to PI Attorneys who are, instead, fully expected to refer their clients to Physicians Group as part of their unlawful cross-referral arrangements, not for the benefit or convenience of their clients; and (3) Physicians Group "has paid a fee to participate in the Ask Gary referral service," when in fact Physicians Group's payments to ASK GARY are not legitimate payments for services, but rather payments to induce unlawful referrals and to create the fiction that ASK GARY is independent from Physicians Group and Kompothecras.

100.    At present, ASK GARY's "disclaimer" reads "1-800-ASK-GARY is a 24/7 free attorney and medical referral service. Physicians Group, LLC has paid a fee to

participate in the medical referral service."  This "disclaimer" remains fraudulent, false, deceptive and misleading because it represents that (1) ASK GARY is a legitimate "medical referral service," when it is not, but rather refers exclusively to Physicians Group; and (2) Physicians Group "has paid a fee to participate in the Ask Gary referral service," when in fact Physicians Group's payments to ASK GARY are not legitimate payments for services, but rather payments to induce unlawful referrals and to create the fiction that ASK GARY is independent from Physicians Group and Kompothecras.

101.    As with prior above-described "disclaimers," the "Standard Marketing Notice," and other efforts described above, the present "disclaimer" is another indication that Kompothecras and the co-defendants have been well-aware throughout the course of this fraud scheme of the unlawful nature of their activities, and have taken active steps to conceal their unlawful activities and/or improperly circumvent legal restrictions prohibiting their arrangements.

**6.    The Affidavit Of Attorney Gadlage Confirms the Unlawful Cross-Referral Relationships Between Kompothecras and the Law Firms that Participated in the ASK GARY Referral Service**

102.    PI Attorney Gadlage has confirmed the existence of the unlawful *quid pro quo* cross-referral arrangements between Kompothecras and PI Attorneys which are described herein.  *See* Ex. 1.  Specifically, Gadlage confirms that Kompothecras required PI Attorneys who received referrals from ASK GARY to refer their clients to Kompothecras-owned clinics for treatment.  *Id.*

103.    During his seven-month tenure at Winters & Yonker's Kentucky office, Gadlage learned that Kompothecras owned and controlled ASK GARY, that ASK GARY

41

was the most important referral source for Winters & Yonker in Kentucky, and that Kompothecras owned a network of clinics in Kentucky that treated motor vehicle accident victims who had No-Fault Benefits. *Id.* ¶¶ 10-11.

104. Gadlage explains in his affidavit that Winters & Yonker and Kompothecras appeared to track the number of their cross-referrals, that he was pressured to refer his clients to the Kompothecras-owned clinics in Kentucky, and that he was fired from Winters & Yonker when he refused to refer his clients to the Kompothecras-owned clinics because he felt it was not in his clients' best interests to treat at those clinics. *Id.*

105. Gadlage was instructed to write a "2" on the interview forms maintained by Winters & Yonker if clients were referred through ASK GARY, and to write a "1" on the interview form if the clients arrived though the law firm's own advertising. *Id.* at ¶ 8.

106. Gadlage and other attorneys were instructed to refer as many of Winters & Yonker's clients as possible for treatment at the Kompothecras-owned clinics in return for the referrals that ASK GARY made to Winters & Yonker. *Id.* at ¶ 12. Pursuant to this arrangement, Kompothecras referred the vast majority of the callers from ASK GARY to Winters & Yonker. *Id.* at ¶¶ 12-13 In return, Winters & Yonker agreed to refer these callers to the Kompothecras-owned clinics, to encourage their clients to keep their appointments at those clinics, and to "flip" callers referred to the law firm by ASK GARY to the Kompothecras-owned clinics, if the clients expressed an interest in or were already treating with a different provider. *Id.* at ¶¶ 13-15, 19.

107. For referrals to Winters & Yonker, ASK GARY receptionists were required to transfer callers directly to Anthony Raiano, an attorney in Winters &

Yonker's Tampa, Florida office who served as intake coordinator for ASK GARY's referrals to the law firm. *Id.* at ¶ 15. If the caller was treating at or considering treating at a non-Kompothecras-owned clinic, Raiano attempted to "flip" the caller to treat at a Kompothecras-owned clinic. *Id.*

108. Raiano's protocol for ASK GARY referrals was also to schedule appointments for them at Kompothecras-owned clients if one was not already in place, and to arrange for Winters & Yonker attorneys to meet clients at their homes or the Kompothecras-owned clinics. *Id.* at ¶ 16.

109. Gadlage personally interviewed many clients who were referred to Winters & Yonker by ASK GARY, and he cannot identify any who were referred by ASK GARY to any clinic other than a Kompothecras-owned clinic. *Id.* at ¶ 18.

110. Because Gadlage felt it was more difficult to resolve claims for clients who treated at the Kompothecras-owned clinics, he believed it was in his clients' best interest to treat with other providers and routinely advised them to do so. *Id.* at ¶ 20.

111. Winters & Yonker maintained a database of clients referred from ASK GARY, and clients referred by the law firm to Kompothecras-owned clinics. *Id.* at ¶¶ 21, 25. Matthew Kannady, an attorney in the Kentucky offices of Winters & Yonker, sent monthly statistical reports to Winters & Yonker partners in Tampa, Florida showing the numbers of clients referred from ASK GARY to the law firm and from the law firm to Kompothecras-owned clinics. *Id.* at ¶ 22.

112. At an April 2011 meeting at Winters & Yonker's Louisville, Kentucky office, Matthew Kannady informed Gadlage and others in that office that Kompothecras

had spoken with Winters & Yonker founder Mark Yonker and other firm partners to express his displeasure with the number of referrals from Winters & Yonker to Kompothecras-owned clinics.  *Id.* at ¶ 23.  At this meeting, Kannady also indicated that Kompothecras had threatened to stop referring patients to Winters & Yonker through ASK GARY, if Winters & Yonker did not increase the number of clients it referred to Kompothecras-owned clinics.  *Id.* at ¶ 24.  Therefore, Gadlage and the others were instructed by Kannady to increase their referrals to the Kompothecras-owned clinics.  *Id.* From this meeting, it appeared to Gadlage that Kompothecras had access to and was tracking the number of referrals his clinics were receiving from Winters & Yonker, and the number of referrals from ASK GARY to Winters & Yonker.  *Id.* at ¶ 23.

113.    On April 19, 2011, approximately one week after the above-described April 2011 meeting, Gadlage was terminated by Winters & Yonker.  *Id.* at ¶¶ 27-28. Gadlage believes he was terminated because he refused to refer his clients to Kompothecras-owned clinics, which would have placed the financial interests of both Winters & Yonker and Kompothecras above the interests of his clients.  *Id.*

114.    Although Gadlage worked in Winters & Yonker's Kentucky offices, the law firm appears to have had the same cross-referral arrangements with Kompothecras and ASK GARY in both Florida and Kentucky.  Indeed, attorney Gadlage states in his affidavit that the cross-referral arrangements between Winters & Yonker's Kentucky offices and the Kompothecras-owned clinics in Kentucky were all coordinated through one or more attorneys in Winters & Yonker's Tampa, Florida office.  *Id.* at ¶ 15. Furthermore, from at least 2008 through 2012, Winters & Yonker represented more

clients in Florida who presented claims to State Farm and treated at Physicians Group than any other law firm in Florida.  The large number of Winters & Yonker clients who also treated at Physicians Group clinics in Florida was not coincidental and, in fact, confirms that Kompothecras and Winters & Yonker had the same unlawful cross-referral arrangements in Florida that they had in Kentucky.

### D.   State Farm's Reliance

115.   The Defendants have submitted, or caused to be submitted, to State Farm facially valid medical records and bills to recover No-Fault Benefits for services and treatments that were purportedly lawfully rendered.

116.   State Farm is under statutory and contractual duties to pay or deny No Fault claims within 30 days.  The facially valid documents submitted to State Farm in support of the unlawful claims and charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to rely on them.

117.   As a result, State Farm has incurred damages of more than $480,000, exclusive of interest and costs.  *See* Ex. 3.

### E.   Information Regarding ASK GARY's Referrals to Physicians Group Is Uniquely Within Defendants' Control

118.   State Farm believes that the claims and charges set forth in Exhibit 3 are a small subset of the total number of State Farm insureds unlawfully referred to and obtained by Physicians Group through the ASK GARY fraud scheme, and that substantially more State Farm insureds who treated at Physicians Group since 2005 were treated as a result of the Defendants' unlawful patient brokering, kickback, self-referral,

FDUTPA, and false, deceptive and misleading advertising scheme, as described herein. Accordingly, State Farm believes that a substantial portion of the more than $19 million in No-Fault Benefits it has paid to Physicians Group since 2005 were for unlawful charges for which the Defendants are liable to State Farm.

119.    In addition to the above-described misconduct, the Defendants have taken steps to thwart State Farm's efforts to determine and prove the true nature of their relationships and activities, as well as whether any particular patient was referred to Physicians Group through ASK GARY.  These steps have included repeatedly refusing to answer deposition questions about these matters, and objecting to the production of related documents and other information.  Furthermore, in a September 2012 deposition, after being questioned in several depositions regarding the referral and other relationships between ASK GARY and Physicians Group, Balot testified that he intentionally deleted information from Physicians Group's electronic record system that would show whether patients were referred from ASK GARY:

> Q:   What kind of document would you have that would show the number of referrals from WS Marketing [ASK GARY] ?
> A.     It's sort of a -- now it's more or less a guesstimate.  In the past I used to have something in the system that showed me where the patient came from, but that field has been eliminated.
> Q.    Why is that?
> A.     Got tired of being asked about it in depositions.
> Q.    Did you eliminate the field for past patients where it previously existed?
> A.     Yeah, totally deleted it.

*See* Ex. 19.

120.    Until Balot intentionally deleted the above-described information regarding patient referrals from ASK GARY to Physicians Group, that information was

readily available to Physicians Group's staff through the "patient information" section of its computer software program.

## IV.  CLAIMS FOR RELIEF

**First Cause of Action**
(Against All Defendants for Common Law Fraud / Fraudulent Misrepresentation)

121.    State Farm incorporates as though fully set forth herein the allegations in Paragraphs 1 through 120 above.

122.    In at least all of the claims described in Exhibit 3 attached hereto, the Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, charges for services that were purportedly lawfully rendered when, in fact, they were not lawfully rendered because they were rendered pursuant to intentional violations of civil, criminal, and administrative statutes and rules relating to the provision of medical services and treatments, namely the Patient Brokering Act, the Patient Self-Referral Act of 1992, the Anti-Kickback Statute, FDUTPA, and the laws and regulations prohibiting chiropractors from engaging in fraudulent, false, deceptive and misleading advertising.

123.    At the time the representations were made to State Farm, the Defendants knew that they were false and fraudulent.

124.    The Defendants made the above-described representations to induce State Farm to rely on them.

125.    State Farm relied on the Defendants' representations that the claims and charges submitted to State Farm were for services that were lawfully rendered when, in fact, they were not.

126. As a direct and proximate result of the above-described misrepresentations, State Farm was damaged in amounts of more than $480,000, exclusive of interest and costs.

127. By virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### Second Cause of Action
(Against All Defendants for Unjust Enrichment)

128. State Farm incorporates as though fully set forth herein the allegations in Paragraphs 1 through 120 above.

129. When State Farm paid No-Fault Benefits based upon facially valid claims and charges that the Defendants submitted, and caused to be submitted, it reasonably believed that it was legally obligated to make such payments.

130. State Farm's payments constitute a benefit of which the Defendants are aware.

131. The Defendants voluntarily accepted and have retained the payments conferred by State Farm.

132. Under these circumstances, as described in paragraphs 1 – 120, retention of those benefits by the Defendants would be inequitable.

133. By virtue of the foregoing, State Farm is entitled to more than $480,000, which has been improperly retained by the Defendants, and any other relief the Court deems equitable, just, and proper.

**Third Cause of Action**

(Against All Defendants for Violations of the Florida Deceptive and Unfair Trade
Practices Act – Damages)

134.    State Farm incorporates as though fully set forth herein the allegations in
Paragraphs 1 through 120 above.

135.    The Defendants' above-described conduct constitutes unfair methods of
competition, unconscionable acts or practices, and unfair or deceptive acts or practices in
the conduct of a trade and commerce.

136.    The Defendants' above-described conduct is unfair because it offends
established public policy and is immoral, unethical, oppressive, unscrupulous and
substantially injurious to consumers.

137.    The Defendants' above-described conduct is deceptive because it is based
upon representations, omissions, and other acts and practices that are likely to mislead
consumers, including State Farm and its insureds, acting reasonably under the
circumstances to the consumer's detriment.

138.    As a result of the Defendants' unfair and deceptive practice, State Farm
has incurred damages of more than $480,000.

139.    By virtue of the foregoing, State Farm seeks a declaratory judgment
declaring that the Defendants' acts and practices are unfair and deceptive in violation of
FDUTPA, an order enjoining the Defendants' from engaging in such unfair and deceptive
acts and practices, and damages of more than $480,000, plus attorneys' fees, costs,
interest, and any other relief the Court deems just and proper.

**Fourth Cause of Action**
(Against Kompothecras and Physicians Group for Violation of Fla. Stat. §456.053
(Patient Self-Referral Act))

140.    State Farm incorporates as though fully set forth herein the allegations in Paragraphs 1 through 120 above.

141.    Each claim set forth in Exhibit 3 reflects bills for services rendered pursuant to unlawful self-referrals, namely self-referrals from Kompothecras through ASK GARY to Physicians Group, an entity in which he is an investor and has an investment interest.

142.    By submitting claims and charges for payment for services that were rendered pursuant to the unlawful self-referrals, Kompothecras and Physicians Group have caused State Farm to sustain damages of more than $480,000.

143.    Because Physicians Group and Kompothecras received payments from State Farm for services that were rendered pursuant to unlawful self-referral, Physicians Group and Kompothecras were obligated to refund those payments under the Patient Self-Referral Act. Fla. Stat. § 456.053(5)(d).

144.    By virtue of the foregoing, State Farm is entitled to compensatory damages of more than $480,000, plus attorneys' fees, costs, interest, and any other relief the Court deems just and proper.

**Fifth Cause of Action**
(Against Physicians Group Under 28 U.S.C § 2201)

145.    State Farm incorporates as though fully set forth herein the allegations in Paragraphs 1 through 120 above.

146.     There is an actual case and controversy between State Farm and Physicians Group, as to all claims and charges submitted by Physicians Group to State Farm for No-Fault Benefits.  To the extent that any such claims and charges that are pending as of the date of this complaint, or which are submitted to State Farm during the pendency of this litigation, are for services and treatments not lawfully rendered by Physicians Group because they were rendered pursuant to intentional violations of criminal, civil and administrative laws relating to the provision of medical services and treatment, namely the Patient Brokering Act, Anti-Kickback Act, Self-Referral Act, FDUTPA and prohibitions against fraudulent, false, deceiving and misleading advertising by chiropractors, State Farm contends that no such claims and charges are owed pursuant to Florida Statutes § 627.736(5)(b)(1)(b).

147.     There is a bona fide, present, and practical need for a declaration as to all such claims and charges

148.     Accordingly, State Farm seeks a judgment declaring that all outstanding claims or charges submitted by Physicians Group to State Farm for No-Fault Benefits are not owed because they are for services and treatments that were not lawfully rendered.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

DATED this 24th day of July, 2013.

By: */s/ David I. Spector*
    DAVID I. SPECTOR
    Fla. Bar No. 086540
    david.spector@akerman.com
    **AKERMAN SENTERFITT**
    222 Lakeview Avenue, Suite 400
    West Palm Beach, Florida  33401
    Telephone:  (561) 653-5000
    Facsimile:   (561) 659-6313

    --and--

    ROSS O. SILVERMAN
    ross.silverman@kattenlaw.com
    (*pro hac vice to be filed*)
    ERIC T. GORTNER
    eric.gortner@kattenlaw.com
    (*pro hac vice to be filed*)
    **KATTEN MUCHIN ROSENMAN LLP**
    525 West Monroe Street
    Chicago, IL 60661-3693
    Telephone:  (312) 902-5200
    Facsimile:   (312) 902-1061

    Attorneys for Plaintiffs