IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE & CASUALTY COMPANY,

    Plaintiffs,

v.                                       Case 8:13-cv-1932-17-TGW

PHYSICIANS GROUP OF SARASOTA, L.L.C.,
PHYSICIANS GROUP, L.L.C., a foreign Delaware
corporation, GARY KOMPOTHECRAS, DAVID
BALOT, DB MEDICAL CONSULTING, INC.,
W.S. MEDIA, INC., a foreign Delaware corporation,
W.S. MARKETING, INC., and WILLIAM SIGELAKIS,

    Defendants.
_____/

## **DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

    COMES NOW Defendants, PHYSICIANS GROUP OF SARASOTA, L.L.C., PHYSICIANS GROUP, L.L.C., a foreign Delaware corporation, GARY KOMPOTHECRAS, DAVID BALOT, DB MEDICAL CONSULTING, INC., W.S. MEDIA, INC., a foreign Delaware corporation, W.S. MARKETING, INC., and WILLIAM SIGELAKIS (collectively "Defendants"), by and through undersigned counsel, and hereby move this Court pursuant to Local Rules 3.02 and 3.04, and Rule 26(c), Federal Rules of Civil Procedure, for the entry of a protective order against Plaintiffs, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE & CASUALTY COMPANY (collectively "State Farm" or "Plaintiffs"). State Farm served discovery outside of the process provided for in the Federal Rules of Civil Procedure and the oversight of this Court and its conduct should be rejected and sanctioned.

I.  **GENERAL FACTUAL BACKGROUND**

   A.  **PLAINTIFFS' EXTRAJUDICIAL DISCOVERY IS IMPERMISSIBLE.**

State Farm served the discovery at issue under the guise of Florida Statutes Section 627.736(6)(b), Florida's PIP statute, to Defendant David Balot, on behalf of Defendant Physicians Group, requesting Mr. Balot to identify how 1,562 insureds, identified by State Farm in 31 pages of spreadsheet attachments, were referred to Physicians Group.  See **Exhibit A**. State Farm sent a second letter to Mr. Balot, on behalf of Physicians Group, requesting the same information related to one particular patient.  See **Exhibit B**.  State Farm sent a third letter to Morgan & Morgan, the attorneys for a patient, requesting information related to that patient and specifically how that patient/insured was referred to that law firm.  See **Exhibit C**; see also **Exhibit D**, Affidavit of Dave Balot addressing Exhibits A, B, and C.[1]

State Farm also served similar discovery on non-party fact witnesses, including State Farm insureds, seeking discovery of matters that are clearly framed by the complaint before this Court, such as the source of referrals to Defendant Physicians Group.  Plaintiffs have also attempted to interview Defendants' former employees, who previously executed certain confidentiality agreements with Defendants as part of their employment, without regard for or addressing these individuals' contractual liability for failing to abide by the terms of these agreements.  See Exhibit D.  Moreover, it is now crystal clear that State Farm's abusive discovery in small personal injury cases – in which some of the Defendants were non-party deponents – was designed to be discovery for the instant matter.

Regardless how such discovery is couched or titled, or whatever means or methods State Farm employs to effectuate the acquisition of such discovery, its discovery efforts are clearly

---

[1] Exhibits A, B, and C have been redacted to the extent they contain patient names in order to comply with HIPAA and Federal Rule of Civil Procedure 5.2.

intended to circumvent the Federal Rules of Civil Procedure and the rules of this Court.  State Farm's use of this discovery is an attempt to gain testimony and documents for potential use against Defendants in this litigation without providing Defendants notice, the opportunity to participate, and the opportunity for legal objection and judicial review.  Moreover, this unauthorized discovery circumvents the numerical limitations on requests such as those contained in Rule 33(a)(1), Federal Rules of Civil Procedure.  State Farm's actions not only constitute a blatant violation of the rules regarding discovery, but are fundamentally unfair.

Rule 3.05(c)(2)(B), Local Rules for the Middle District of Florida, provide that "[u]nless otherwise ordered by the Court, a party may not seek discovery from **any** source before the [Case Management] meeting." (emphasis added).  Pursuant to this Court's Local Rules, the parties to an action are provided 60 days from service of the complaint to meet to prepare the Case Management Report.  Thus, State Farm's discovery attempts in all of their various forms and iterations predating the case management meeting, much less service of the complaint on any of the Defendants, are wholly improper.  State Farm's behavior is particularly troublesome given the extensive discovery it has already attempted to obtain and continues to try to obtain in spite of its knowledge and awareness of this Court's rules, leaving open and unresolved the question of State Farm's ability to follow and adhere to other rules of this Court.

In fact, when Defendants realized that that State Farm engaged in this improper discovery, it attempted to work through these issues with counsel for State Farm.  As recently as August 14, 2013, undersigned counsel received a response from counsel for State Farm maintaining that it intends to continue engaging in this extrajudicial discovery without regard for the limitations of discovery as expressed in the Local Rules or the potential liability of Physicians Group's former employees for violations of their confidentiality agreements.

**B. THIS LITIGATION IS STATE FARM'S ATTEMPT TO GAIN A TACTICAL ADVANTAGE IN DOZENS OF ONGOING STATE COURT MATTERS.**

State Farm is choreographing a monstrous effort to engage in extrajudicial discovery in an attempt to uncover evidence not only for the purposes of gaining an advantage in this litigation, but to also seize on the opportunity to gain whatever advantage it can in over 1,000 related pending state court matters. See Exhibit D. State Farm owes Physicians Group over $10 million in these pending state court matters, which it seeks to delay paying by filing the instant suit in derogation of the streamlined process crafted by the Florida legislature for personal injury litigation. See infra § E; see also Exhibit D.

State Farm used and continues to use the state court matters in which its insureds are involved - and in which it has retained counsel supposedly to represent these *insureds* - as fishing expeditions for evidence to use either in this Court or in a grander scheme to attack Defendants before the Florida Bar Board of Governors. State Farm's efforts disregard and ignore the role of the attorneys paid by State Farm to advocate on behalf of the real parties in interest; State Farm's insureds. Instead, State Farm intends to use the action before this Court to gain tactical advantages in the cases already filed and pending, and those state court cases to be filed in the future.

Even as recently as this past week, Judge Rapkin in the Twelfth Judicial Circuit in Sarasota County identified on the record his concerns that the whiplash case before his court seemed to be an attempt by State Farm to gain discovery from Physicians Group, a non-party in that case, but a party in the action now before this Court, for purposes of the litigation in this action. In that case, the defendant is insured by State Farm, which is paying for a lawyer (Mr.

4

Hutchens) to advocate a defense of that personal injury defendant. Judge Rapkin saw, however, that the case was being litigated for a different purpose. Judge Rapkin stated, in relevant part:

> THE COURT: It's a whiplash case that's made into a major issue.

See **Exhibit E**: Pg. 3, lines 8-9.

> THE COURT: This isn't the State Farm case basically that we're trying here?

See Exhibit E: Pg. 5, lines 23-24.

> THE COURT: Do you think you're going to be trying all this in the whiplash case?

See Exhibit E: Pg. 7, lines 2-3.

> MR. CARROLL: Your Honor, from our perspective, and Judge Dubinsky has a major case involving this issue, Med Plus, when it's actually more the insurance industry as opposed to this whiplash case.
>
> THE COURT: I understand.
>
> MR. CARROLL: Judge Dubinsky ruled that – I know it's a different case. I just, Your Honor –
>
> THE COURT: It's been in front of Dubinsky, it's been in front of Judge Dunnigan, it's been in front of everybody.

See Exhibit E: Pg. 9, lines 22-25; Pg. 10, lines 1-6.

> MR. CARROLL: And the issue, Your Honor, just so long as they don't share it with the State Farm adjuster.
>
> MR. HUTCHENS: What is the basis for that?
>
> THE COURT: Well, the basis for that is that State Farm shouldn't use this case to get discovery in the other case without that counsel being involved.
>
> MR. HUTCHENS: Fine, Your Honor. But my client, as you know –

>    THE COURT: Your client is an individual.

See Exhibit E, Pg. 14, lines 12-20.

The Sarasota action is not the only instance of this type of conduct, but it is the most recent example. In fact, the deposition testimony of Mr. David Balot, attached by State Farm to its complaint, is emblematic of a larger and more concentrated effort by State Farm to use the state court proceedings in which State Farm insureds are involved to obtain discovery for the litigation before this Court. Once again, Mr. Balot's deposition, as the records custodian for the treating physicians, went on for hours as the defense lawyer – paid for by State Farm – exhaustively explored Physicians Group's business and attempted to explore Mr. Balot's personal business interests.

Though State Farm has attached only a portion of Mr. Balot's deposition, and thus not revealing the lengths that it has gone to in order to support the instant case, the entirety of the deposition highlights the real cause for concern. Mr. Balot was deposed as the records custodian of a non-party to the action. In total, Mr. Balot's deposition exceeded 100 pages, an unheard of length for a non-party witness to simply testify that the documents produced constitute the authentic business records of a non-party corporation.[2] Even as this Motion is filed, State Farm is taking Mr. Balot's deposition yet again in one of these thousands of pending state court matters. See Exhibit D.

State Farm's efforts to attack, vilify, and waste all available resources of the Defendants is particularly problematic in these state court proceedings as Defendants are typically non-parties. As non-parties, Defendants routinely lack standing in these state court matters to

---

[2] Of potentially equal concern now, many of these depositions were taken by another firm that simultaneously represented another business owned by Defendant Dr. Kompothecras. There was no disclosure to Dr. Kompothecras of the purpose of those depositions or conflict waiver agreeing to the simultaneous representation directly adverse to his interests.

challenge State Farm's unremitting discovery efforts, including the taking of hundreds of depositions lasting 2, 3, and 4 hours or more of Physicians Group's records custodian and other employees, and countless subpoenas for the production of documents, all of which are being coordinated at the behest of State Farm. See Exhibit D. State Farm is coordinating these efforts to procure evidence to be used in this litigation, before this Court, and such conduct constitutes a flagrant abuse of the discovery process and this Court's Local Rules.

    **C.    DEFENDANTS' CONCERNS ARE WELL-FOUNDED BASED ON STATE FARM'S USE OF THESE SAME TACTICS IN OTHER LITIGATION.**

        **1.    STATE FARM'S OLD MODEL OF ATTACKING INSUREDS.**

A 2007 investigation by CNN reported that major car insurance companies, including State Farm, were increasingly fighting claims from insureds alleging injury. See **Exhibit F**, a copy of the 2007 CNN article. State Farm's model of attacking its insureds was revealed by the CNN article and the disclosure of what is otherwise referred to as the McKinsey Report. According to the CNN report, the "consulting giant" McKinsey & Co. developed a strategy employed by State Farm to make the victims of automobile accidents "look like they are trying to defraud the insurers." Id. State Farm's purpose in using this tactic was to increase profits by "denying a claim, denying settlement of the claim and defending against the claim in court." Id.

        **2.    STATE FARM'S ATTACKS ON PROVIDERS.**

Consistent with the CNN article and the disclosure of the McKinsey Report, State Farm launched attacks on providers of services to insureds. In a recent case from the Indiana Court of Appeals, styled Radcliff v. State Farm Fire & Casualty Co., Case No. 29A04-1111-CT-571, (2013) attached hereto as **Exhibit G**, State Farm's strategy for no holds barred legal warfare was exposed by the Indiana courts. In Radcliff, and in the action now before this Court, State Farm actively pursued its target – providers – with accusations of insurance fraud, allegations of

7

criminal misconduct, and claims of racketeering and fraud. State Farm and its employees' mission to "seek and destroy" providers like the Defendants in this action is readily apparent in Radcliff, wherein the Indiana Court of Appeals recently upheld one of the largest defamation verdicts in United States history against State Farm ($14.5 million). See Exhibit G, Pgs. 2-3.

Radcliff involved a roofer who stated he would "fight" State Farm on behalf of its insureds who were being denied claims at a staggering rate after a massive hail storm generated nearly 50,000 State Farm claims. While the findings show that most contractors were actively discouraging clients of State Farm to seek out their services (given the incredible amounts of claim denials issued by the "Good Neighbor"), Mr. Radcliff was undeterred and "took his clients' concerns to the Department of Insurance, where he learned that State Farm was already being investigated for unfair-claims practices." Id. at 4. In response, the court found that State Farm actively targeted Mr. Radcliff by "forwarding their insurance-fraud investigation to the National Insurance Crime Bureau ("NICB"), which is a not-for-profit organization that acts as a liaison between insurers and law enforcement." Id. This action ultimately led to Mr. Radcliff's arrest. Id. at 19-20. As set forth in the Radcliff opinion, State Farm did not provide complete evidence to NICB, first scrubbing information harmful to their case.

To counter-act the negative publicity State Farm received by Mr. Radcliff standing up to its abusive claims practices, it immediately released the following press release after Mr. Radcliff's arrest:

> We are cooperating with and assisting the authorities in their investigation. As the nation's largest property and casualty insurance company, State Farm is committed to helping law enforcement in developing and implementing programs that help curb crimes like fraud because it impacts our business and our customers.

Id. at 20.  State Farm's media specialist, testified that "Radcliff's arrest gave State Farm the 'opportunity to tell [its] story in a positive light,' which assisted in defraying the negative media attention that it had received." Id.  Then, after Mr. Radcliff's arrest, Tom Cockerill, part of State Farm's Special Investigation Unit ("SIU") and one of the lead "investigators" into Mr. Radcliff's purported wrong doing, "spent part of his day forwarding news reports about the arrest." Id. Three days after Mr. Radcliff's arrest, "Cockerill visited Radcliff's wife's MySpace page and found a picture that someone had posted depicting a stick-figure Radcliff behind bars being raped, which he then forwarded as a link to Todd Burris, the NICB special agent who had worked on the case, and told him to 'enjoy.'" Id.

Incredibly, for his actions, Cockerill was later awarded the Investigator of the Year by the International Association of Special Investigation Units for his work on this case, received $1000 and a trophy.  Id.  An employee of State Farm who nominated Cockerill for this award.  Id. at 21.

Mr. Radcliff, on the other hand, watched in horror as State Farm's intricate plan to silence him and to destroy his business came to fruition.  His company went from 400 employees to just 15 at the time of trial.  Id. at 22.  It soon became painfully obvious that State Farm's calculated gambit was paying off "as Radcliff's competition quickly began to use his arrest against him. His customers 'saw the newspaper articles and they heard the salespeople's pitches about who [he] was[,] that [he's] a criminal and [commits] insurance fraud.' Radcliff got phone calls from clients canceling their contracts and demanding the return of their deposits." Id. at 22.

Apparently not content with the destruction of Mr. Radcliff's life and business, approximately one month after he was arrested, State Farm filed a civil complaint against him and his business alleging fraud and racketeering.  Id. at 22-23.  Specifically, "State Farm alleged that Radcliff and CPM had a fraudulent scheme of intentionally damaging homes to simulate hail

9

and wind damage, obtaining powers of attorney from the homeowners, and then submitting false insurance claims." Id.

Clearly State Farm has no problem making horrible allegations against those to whom it owes money and others who will not simply kowtow to bully tactics. Notwithstanding, after over a month long trial the jury clearly and unequivocally rejected State Farm's tactics and awarded Mr. Radcliff $14.5 million against State Farm for destroying his business and attempting to destroy him, which State Farm admitted "is one of the largest in United States history." Id. at 24.

### 3. STATE FARM'S ILLEGAL ATTEMPTS TO GAIN INFLUENCE.

'Attacking providers is only one of the tools State Farm utilizes in its arsenal of legal weaponry. In a pending federal lawsuit, it is alleged that State Farm took illegal action to affect the Illinois State Supreme Court judicial race specifically to ensure that a $1.05 billion dollar judgment against its company and in favor of its insureds' was overturned. See **Exhibit H** attached hereto. The lawsuit, Hale, et al. v. State Farm, et al., now pending as a class action in the United States District Court in and for the Southern District of Illinois, alleges that from 2003 to the present, State Farm and its co-conspirators "created and conducted the RICO enterprise described below to enable State Farm to evade payment of a $1.05 billion judgment affirmed in favor of approximately 4.7 million State Farm policyholders by the Illinois Appellate Court." Id. at ¶ 1.

In Hale, the plaintiffs allege that State Farm and its co-conspirators actively recruited state court trial judge Lloyd Karmeier to run for the open seat on the Illinois Supreme Court, directed his campaign, developed a vast network of contributors and funneled as much as $4 million to the campaign. Id. at ¶ 9. It is further alleged that after achieving Karmeier's election,

State Farm deliberately concealed all of this from the Illinois Supreme Court while its appeal was pending. Id. Subsequently, Justice Karmeier cast his vote overturning the $1.05 billion judgment. Id. at ¶ 8; See also Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill.2d 100, 835 N.E.2d 801 (Ill. 2005).

The Radcliff and Hale cases demonstrate the extraordinary measures that State Farm now employs to attack providers and gain influence in judicial proceedings. The action before this Court is yet another example of what is quickly becoming a pattern showing State Farm's take no prisoners conduct, which is indicative of the nature of the litigation strategy it employs that now affects the case before this Court.

### D. PLAINTIFFS' COMPLAINT IS FATALLY DEFICIENT.

The conduct complained of by State Farm, though characterized as criminal in over 120 factual paragraphs and over 50 pages, truly relates to legitimate business operations, such as physical locations of offices and corporate space, corporate name changes, website redesign, the location and content of legal disclaimers, and ownership and leasing issues.

To the extent State Farm alleges any actual wrongdoing, State Farm's allegations of misconduct are tied to entities that are not parties to this action, such as Winters & Yonker. State Farm devotes large portions of its complaint to discussing the alleged misconduct of Winters & Yonker and the claims of an individual identified as Sharon Langford in an action styled Langford v. Winters & Yonker & Rousselle, P.S.C., et al., No. 10 CI 00518. There is no claim now before this Court based on the morass of allegations related to that separate litigation involving Kentucky lawyers and clinics in Kentucky. Of note, last year the Kentucky Supreme Court ruled that Attorney Gadlage[3] – whose affidavit is Exhibit A to State Farm's Complaint –

---

[3] Gadlage's affidavit, attached to State Farm's complaint, refers to an entity that is not owned by the Defendants.

11

had no claim against Winters & Yonkers & Rousselle, his former employer that he sued. See Gadlage v. Winters & Yonker, Attorneys at Law, P.S.C., 2011 WL 6888538 (W.D. Ky. 2011).

To the extent State Farm alleges wrongdoing, the allegations are founded upon the unscrupulous testimony of disgruntled former employees of non-parties, such as Anthony Gadlage. Mr. Gadlage worked for Winters & Yonker, **not** the Defendants. According to State Farm, Mr. Gadlage's assertions are apparently "corroborated" by a Bloomberg newspaper article.

However, the Bloomberg article, upon which State Farm relies, was written based on statements by Dr. Jeffrey Lauffer, a former employee of Physicians Group, who has since contradicted his statements to that author in sworn deposition testimony. For example, the Bloomberg Article (attached to State Farm's Complaint as Exhibit 15), contains the following statements, which the author attributes to Dr. Lauffer:

> Chiropractors had "no control over the patients" at Physician's Group because treatment was directed by lawyers, according to a deposition by Jeffrey Lauffer, a former supervisor for the Kompothecras chain. Attorneys directed the clinic to cancel or order procedures depending on how much insurance a patient had, Lauffer said in the sworn statement, which he gave on behalf of an insurer contesting Physician's Group bills.
>
> Lauffer said he believed the intervention of non-clinical staff in the treatment of patients was illegal.

See State Farm Complaint, Exhibit 15.

However, Dr. Lauffer testified as follows on February 15, 2012:

Q. When you were a treating chiropractor at Physicians Group, did you ever discuss the chiropractic care that you would give to a particular patient with the patient's attorney?

A. No. At Physicians Group, we were kept relatively isolated from the attorneys, as doctors. We were told that if attorneys called, that there would be somebody else that could handle that for us.

See **Exhibit I**, relevant portions of Dr. Lauffer's testimony (Pg. 61, lines 5-14).

Dr. Lauffer also testified to the following:

12

> Q. Okay. During the time that you were working as an MRI tech, did you ever discuss the MRIs that you would perform with any attorneys?
>
> A. No.
>
> Q. Did you get any direction from attorneys about how to perform your job as an MRI tech?
>
> A. No.

See Exhibit I, Pg. 71, lines 19-25.

Additionally, the Bloomberg article attributes to Dr. Lauffer the following statement:

> A computerized notes system called MedPlus was used at Physician's Group to relay the lawyers' instructions to medical staff, according to Lauffer.

See State Farm Complaint, Exhibit 15.

However, Dr. Lauffer testified as follows during his deposition:

> Q. When you were working as a chiropractor for Physicians Group, LLC, would you make direct entries into the Med Plus notes?
>
> A. No, only as an MRI tech. MRI techs were the only doctors that had access to the Med Plus Notes.

See Exhibit I, Pg. 60, lines 19-23.

Tellingly, Dr. Lauffer is a party to a separate lawsuit involving the Defendants, in which Defendants obtained a court order enjoining Dr. Lauffer and his attorneys from the further dissemination of protected trade secret and other confidential information and documents stolen by Dr. Lauffer from the Defendants during his employment. See **Exhibit J**, Order Enjoining Dr. Lauffer.

In large part, State Farm complains of alleged violations which do not give rise to private causes of action, including alleged violations of the Patient Brokering Act, Anti-Kickback Statute, Patient Self-Referral Act, Florida Bar Rules, and False, Misleading, and Deceptive Advertising in violation of the Florida Board of Chiropractic Medicine rules. The only civil

claim under Florida law, while factually deficient as plead and entirely without merit, is the purported violation of Florida's Deceptive and Unfair Trade Practices Act.

State Farm's damages claim is as poorly plead as its causes of action. State Farm highlights the fact that it has allegedly paid out since 2005 "19 million in No-Fault Benefits" in an effort to grab the reader's attention. However, State Farm's purported "actual" damages claim falls substantially below this amount, at $480,000. State Farm fails to also mention that there are over 1,000 active state court disputes between State Farm and Physicians Group and that the state court actions are based on State Farm's failure to pay Physicians Group over $10,000,000 in claims. See Exhibit D. These state court actions are the proper forum for the disputes now at issue before this Court. Yet State Farm has chosen to file the instant action and to use other state court cases in which Defendants are not parties, to conduct discovery related to this case. The conduct neither promotes judicial economy nor complies with the Court's rules on discovery.

### E. PIP STATUTE PROVIDES REMEDIES AND PROCEDURES FOR MISCONDUCT ALLEGED.

Florida law provides State Farm with remedies and procedures to follow when it doubts or disbelieves the veracity of a claim for remuneration. When this Court reviews the complaint and disregards the surplusage, it is clear that the claims are devoid of any factual or legal basis, and irrelevant information included for no other purpose other than to inflame and ignite the passions of a reader. The Court will find that State Farm's real claims are based on allegations that it allegedly paid too much for the services rendered by the Defendants to victims of motor vehicle accidents by State Farm insureds. See Exhibit D.

The remedies and procedures available to State Farm when it, or any insurer, believes they are being overcharged are specified in detail in Florida's PIP Statutes. State Farm is not

14

only aware of these statutes, but relentlessly and aggressively pursues all available remedies to it under Florida law in the appropriate forum. Notwithstanding, this Court is being asked to review and/or intervene in at least a thousand pending state court matters and provide relief that State Farm already has available to it in these matters.

Defendants believe that State Farm filed the present action in this Court in an effort to inflict the most damage possible to Defendants' reputation and character and to force Defendants to expend exorbitant resources defending their personal and professional character and reputation and to delay, as long as possible, the payment of millions dollars which is otherwise due and owing to Defendants. It is no coincidence that this action was filed a mere 23 days after State Farm and other insurers lost a significant matter in the Florida Supreme Court when the Court ruled in favor of policyholders and medical providers, such as Defendants, and against insurance companies.

In <u>Geico General Insurance Co. v. Virtual Imaging Services, Inc.</u>, No. SC12-905 (Fla. July 3, 2013), Virtual Imaging submitted a bill to Geico under a patient's personal-injury protection coverage. <u>Id</u>. at *6. The bill submitted to Geico totaled $3,600, but Geico, using a formula it derived from a Medicare fee schedule, paid slightly less than $2,000. <u>Id</u>. The Court held that Florida law precluded Geico, and other insurers, from using the Medicare-based formula unless the insurer disclosed its intent to do so in its policies with insureds. <u>Id</u>. at *21.

As a result of the <u>Virtual Imaging</u> decision, State Farm owes millions of dollars to Defendant Physicians Group. State Farm seized on the opportunity to take advantage of the Medicare fee schedules to limit reimbursements to Physicians Group and is now required to pay Physicians Group the differences between what they were billed and the reduced amounts paid. While many insurers have begun making the payments mandated by the <u>Virtual Imaging</u>

holding, State Farm has not. Instead, State Farm filed the instant action in yet another transparent attempt to avoid paying the monies that the Florida Supreme Court has already determined it owes to the Physicians Group.

### F.  STATE FARM DRAFTED ITS COMPLAINT TO ATTRACT THE MEDIA AND TO COURT PUBLIC OPINION.

Defendants filed a motion to dismiss that challenges federal court jurisdiction, and the quality and sufficiency of the allegations upon which State Farm's claims rest, through the proper procedural mechanism. It is clear at even this early stage of litigation that State Farm intends to paint with a broad brush and use words like "massive fraud scheme," "disbanded," "ethical violations," "shell companies," and "Florida Bar investigations," in an effort to attract and retain the attention of the news media and to portray Defendants in this Court and in the court of public opinion, including the Florida Bar Board of Governors, as criminal.

Nonetheless, in consideration of State Farm's conduct in the Radcliff and Hale cases, and based on the conduct and actions of State Farm to date in this action and the thousands of ongoing state court matters, it should be abundantly clear that State Farm not only disregarded the rules of this Court in issuing the various discovery outlined above, but that State Farm has no intention of following the rules of any court or legislature. It is also clear that State Farm will employ whatever methods it can to destroy providers, such as the Defendants.

### MEMORANDUM

### I.  LEGAL STANDARD AND ARGUMENT

"A trial judge has broad discretion to control the course of discovery," and the Eleventh Circuit "will not disturb discovery rulings absent an abuse of discretion." Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co., 748 F.2d 602, 609 (11th Cir. 1985). "The decision to enter a protective order is within the court's discretion and does not depend on a legal

privilege." Auto-Owners Ins. Co. v. SE Floating Docks, Inc., 231 F.R.D. 426, 429 (M.D. Fla. 2005) (citing Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1548 (11th Cir. 1985)).

Rule 26(c), Federal Rules of Civil Procedure, provides that a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including a protective order "forbidding the disclosure or discovery," "prescribing a discovery method other than the one selected by the party seeking discovery," "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters," and "designating the persons who may be present while the discovery is conducted." Fed. R. Civ. P. 26(c)(1)(A),(C)-(F) (2013).

Defendants request that the Court enter an order preventing further violations of the discovery process. The discovery violations at issue certainly include the discovery served by State Farm on Defendant David Balot, on behalf of Defendant Physicians Group, pursuant to Florida Statutes Section 627.736(6)(b), the discovery letters issued by State Farm to attorneys for State Farm insureds that were treated by Physicians Group physicians, the discovery inquiries issued by State Farm to its own insureds, the contacts made by State Farm and its counsel to Defendants' former employees, and any additional efforts undertaken by State Farm which Defendants are heretofore not aware of given State Farm's efforts to circumvent the Court's rules and hide these violations. As noted previously, the discovery directly relates to the core issues in the pending litigation including, among other things, the claims submitted to State Farm by Defendants, the veracity of those claims, and the subsequent payment or non-payment of those claims.

Defendants also seek to ensure that they are properly notified of and allowed to participate in any future discovery undertaken by State Farm. Defendants also seek to exclude
17

any documents or testimony obtained already conducted pursuant to such discovery. The information obtained from the discovery should not be admitted in this litigation for any purpose, including impeachment. See Auto-Owners Ins. Co., 231 F.R.D. at 428 ("Local Rule 3.02(a) … provides in relevant part that a party desiring to take the deposition 'of any person' must give at least 10 days written notice to every other party in the action and the deponent."). According to previous Middle District orders:

> Not only [does a party] have a personal interest in receiving adequate notice of depositions, a party has standing to move to enforce the Court's orders and rules. Cf., Central Bank of Tampa, 128 F.R.D. 285 (1989) (granting defendant's motion to quash and for a protective order as to subpoena directed to non-party that did not comply with Fed.R.Civ.P. 27); Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial, ¶ 11.2286 (The Rutter Group 2005) ("Prior to the deposition, the nonparty witness, *or any party* may move: to quash the subpoena (e.g., for improper service, inadequate description, or lack of control of the designated documents)...") (emphasis in original).

Id. Defendants move for an order enforcing the FRCP and this Court's rules as to State Farm's extra-judicial discovery. Defendants therefore request an order preventing further discovery without notice and preventing improperly obtained information from being used against Defendants.

The Court should reject any argument by State Farm that it has some other legitimate purposes for the discovery issued, including its ability to assess the validity of claims and/or the defense of ongoing state court litigation and that such purposes are unrelated to the case at bar. In a recent matter in which the U.S. Securities and Exchange Commission ("SEC") sought to conduct an "extra-judicial deposition" of a third party without providing notice to the defendants in a pending civil matter in which the third party's testimony was relevant, the United States District Court for the Western District of Texas sanctioned the SEC for multiple violations of the FRCP. The Court held that although the filing of a civil action "does not inhibit the SEC's broad

authority to investigate securities-law violations, the [SEC] cannot administer an extra-judicial deposition regarding an investigation, elicit testimony during that deposition regarding allegations made in the [pending civil action] for use against the [defendants], and then claim immunity from the FRCP by labeling the deposition as 'investigative.'" SEC v. Life Partners Holdings, Inc. et al., Case No. 1:12-CV-00033-JRN (W.D. Tex. Sept. 27, 2012). The Plaintiff's discovery related to this action are a similar attempt to do an end-run around the FRCP.

As in the Life Partners case, this argument should be rejected. Simply put, Plaintiffs are conducting and, unless constrained, may continue to conduct extra-judicial discovery. The discovery is directly relevant to this case and it is being obtained without notice to the Defendants and without the opportunity for the Defendants to participate in the discovery process.

Defendants only seek to ensure that discovery is conducted fairly and according to the FRCP and this Court's rules. Defendants request that they be given notice of and the opportunity to participate in discovery and that any discovery responses or other information procured based on previous discovery issued without notice to the Defendants be excluded from the instant litigation.

WHEREFORE, Defendants respectfully requests that the Court enter a protective order (i) forbidding Plaintiffs from issuing any discovery that seeks documents or testimony outside of the discovery process provided for by the FRCP and this Court's procedures and (ii) prohibiting Plaintiffs from using information in this litigation that was gained from discovery already conducted.

### Certificate of Compliance with Local Rule 3.01(g)

Pursuant to Local Rule 3.01(g) and in a good-faith effort to resolve the issues presented by this Motion, counsel for Defendants has conferred with counsel for State Farm. Counsel for State Farm agreed to a moratorium on its discovery efforts while it considered the issues raised by Defendants, with a promise of a final decision by Monday August 12, 2013. On August 14, 2013, Defendants were notified that State Farm intended to continue with the discovery related to this case outside this Court's rules.

Dated this 16th day of August, 2013.

/s/John E. Johnson
JOHN E. JOHNSON
Florida Bar No. 593000
WILLIAM P. CASSIDY, JR.
Florida Bar No. 332630
NICOLE DEESE NEWLON
Florida Bar No. 0832391
**SHUTTS & BOWEN LLP**
4301 W. Boy Scout Blvd., Ste. 300
Tampa, Florida 33607
Telephone: (813) 229-8900
Facsimile: (813) 229-8901
Attorneys for Defendants

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day August, 2013, this document was electronically filed with the Clerk of this Court by using the CM/ECF system, which will serve a copy on all counsel of record.

/s/John E. Johnson
Attorney