**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE & CASUALTY COMPANY,

      Plaintiffs,

v.                               CASE NO: 8:13-cv-01932-EAK-TGW

PHYSICIANS GROUP OF SARASOTA, L.L.C.,
PHYSICIANS GROUP, L.L.C., a foreign Delaware
Corporation, GARY KOMPOTHECRAS, DAVID
BALOT, DB MEDICAL CONSULTING, INC.,
W.S. MEDIA, INC., a foreign Delaware corporation,
W.S. MARKETING, INC., and WILLIAM SIGELAKIS,

      Defendants.

PHYSICIANS GROUP, L.L.C., a foreign Delaware
Corporation,

      Counterclaim Plaintiff

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE & CASUALTY COMPANY,

      Counterclaim Defendants
_____/

**PHYSICIAN GROUP'S MOTION TO QUASH NON-PARTY
SUBPONEAS OR IN THE ALTERNATIVE MOTION FOR
PROTECTIVE ORDER AND REQUEST FOR ORAL ARGUMENT**

Defendant/Counterclaim-Plaintiff Physicians Group, LLC ("Physicians Group") and

Defendant Gary Kompothecras (collectively "Defendants"), by and through undersigned counsel,

hereby file their Motion to Quash Non-Party Subpoenas or in the Alternative Motion for

Protective Order.  For the reasons that follow, Defendants respectfully request that the Court

1

quash the non-party subpoenas at issue (attached hereto as Exhibits A and Composite B, respectively) or at minimum enter a protective order curbing State Farm's abusive discovery practices.

## MEMORANDUM OF LAW

### I.     INTRODUCTION

State Farm has turned to its usual bag of tricks in bringing this case and conducting abusive discovery.  Throughout the United States, when faced with a threat (here owing Physicians Group approximately **$10 million** in unpaid claims) the insurance behemoth goes on the offense and attempts to drown its adversaries in stacks of paper discovery.  Part of its usual litigation practice is to send out reams of subpoenas to non-parties meant to overstep the bounds of traditional discovery and draw into the litigation those otherwise unrelated individuals or entities in an attempt to stigmatize its adversaries or otherwise obtain indirectly that which it knows could never be obtained directly under the confines of Rule 34.

This case is no different.  State Farm has within a week's time served notices related to **twelve (12)** non-party subpoenas amounting to over 100 pages of service documents.  These subpoenas, seek confidential and otherwise protectable commercial information to which State Farm has no right to access via Rule 45 or otherwise.  Indeed, one of the subpoenas is to Bank of America for personal bank records of <u>both</u> Dr. Kompothecras <u>and</u> his non-party wife.  Additionally, State Farm has begun to subpoena law firms (so far four total) that have merely referred their clients to Physicians Group for medical treatment, thereby casting nothing more than an indiscriminate net into a hopeful sea of information by requesting nearly forty (40) categories of documents from each firm.

The obvious, but unstated, intent of this oppressive exercise is to stigmatize Physicians Group within the legal community so that these referral sources stop sending patients for quality care, as the cost of doing business with Physicians Group would require dedicating dozens of manpower hours compiling inane information designed simply to harass, annoy and oppress those who dare do business with this Joint Commission accredited institution. State Farm clearly understands the direct relationship quality care received from Physicians Group has upon the amount of money insurers, like State Farm, have to pay out in settlements due to the negligence of their insureds or to their insureds who purchase expensive uninsured or underinsured motorist coverage from State Farm. This is at the very heart of the discovery at issue, as State Farm whether by hook or crook intends to ensure Physicians Group is put out of business and understands there is no better way to accomplish this goal than to create artificial risks (like grossly over broad subpoenas) to those who choose to send clients to these clinics. The Court should not countenance State Farm's unscrupulous tactics, which have been tried and tested throughout the country.

**State Farm's Litigation Playbook**

State Farm has a long and sordid history of using litigation to crush financially weaker opponents. As early as 2007, national media picked up on tactics employed by State Farm to make the victims of automobile accidents "look like they are trying to defraud the insurers." Exhibit C, copy of the 2007 CNN article. State Farm's purpose in using this tactic was to increase profits by "denying a claim, denying settlement of the claim and defending against the claim in court." *Id.* Consistent with the CNN article, State Farm has more recently launched attacks on providers of services to insureds. In a recent case from the Indiana Court of Appeals, styled *Radcliff v. State Farm Fire & Casualty Co.*, Case No. 29A04-1111-CT-571, (2013) attached hereto as Exhibit D, State Farm's strategy for no holds barred legal warfare was exposed by the Indiana courts.

3

In *Radcliff*, and in the action now before this Court, State Farm actively pursued its target – providers of services to insureds – with accusations of insurance fraud, allegations of criminal misconduct, and claims of racketeering and fraud. State Farm and its employees' mission to "seek and destroy" providers like the Defendants in this action is readily apparent in *Radcliff*, wherein the Indiana Court of Appeals recently upheld one of the largest defamation verdicts in United States history against State Farm ($14.5 million). See Exhibit D, Pgs. 2-3.

*Radcliff* involved a roofer who stated he would "fight" State Farm on behalf of its insureds who were being denied claims at a staggering rate after a massive hail storm generated nearly 50,000 State Farm claims. While the findings show that most contractors were actively discouraging clients of State Farm to seek out their services (given the incredible amounts of claim denials issued by the "Good Neighbor"), Mr. Radcliff was undeterred and "took his clients' concerns to the Department of Insurance, where he learned that State Farm was already being investigated for unfair-claims practices." *Id*. at 4. In response, the court found that State Farm actively targeted Mr. Radcliff by "forwarding their insurance-fraud investigation to the National Insurance Crime Bureau ("NICB"), which is a not-for-profit organization that acts as a liaison between insurers and law enforcement." *Id*. This action ultimately led to Mr. Radcliff's arrest. *Id*. at 19-20. As set forth in the Radcliff opinion, State Farm did not provide complete evidence to NICB, first scrubbing information harmful to their case.

To counter-act the negative publicity State Farm received by Mr. Radcliff standing up to its abusive claims practices, State Farm immediately released the following press release after Mr. Radcliff's arrest:

> We are cooperating with and assisting the authorities in their investigation. As the nation's largest property and casualty insurance company, State Farm is committed to helping law enforcement in developing and implementing programs that help

4

curb crimes like fraud because it impacts our business and our customers.

*Id*. at 20. State Farm's media specialist, testified that "Radcliff's arrest gave State Farm the 'opportunity to tell [its] story in a positive light,' which assisted in defraying the negative media attention that it had received." *Id*. Then, after Mr. Radcliff's arrest, Tom Cockerill, part of State Farm's Special Investigation Unit ("SIU") and one of the lead "investigators" into Mr. Radcliff's purported wrong doing, "spent part of his day forwarding news reports about the arrest." *Id.* Three days after Mr. Radcliff's arrest, "Cockerill visited Radcliff's wife's MySpace page and found a picture that someone had posted depicting a stick-figure Radcliff behind bars being raped, which he then forwarded as a link to Todd Burris, the NICB special agent who had worked on the case, and told him to 'enjoy.'" *Id*. Incredibly, for his actions, Cockerill was later awarded the Investigator of the Year by the International Association of Special Investigation Units for his work on this case, received $1000 and a trophy. *Id.* Tellingly, an employee of State Farm who nominated Cockerill for this award. *Id.* at 21.

Mr. Radcliff, on the other hand, watched in horror as State Farm's intricate plan to silence him and to destroy his business came to fruition. His company went from 400 employees to just 15 at the time of trial. *Id*. at 22. It soon became painfully obvious that State Farm's calculated gambit was paying off "as Radcliff's competition quickly began to use his arrest against him. His customers 'saw the newspaper articles and they heard the salespeople's pitches about who [he] was[,] that [he's] a criminal and [commits] insurance fraud.' Radcliff got phone calls from clients canceling their contracts and demanding the return of their deposits." *Id.* at 22. Apparently not content with the destruction of Mr. Radcliff's life and business, approximately one month after he was arrested, State Farm filed a civil complaint against him and his business alleging fraud and racketeering. *Id*. at 22-23. Specifically, "State Farm alleged that Radcliff and CPM had a

fraudulent scheme of intentionally damaging homes to simulate hail and wind damage, obtaining powers of attorney from the homeowners, and then submitting false insurance claims." *Id*.

Clearly State Farm has no problem making horrible and unfounded allegations against those to whom it owes money and others who will not simply kowtow to bully tactics, which is exactly the intended design of the non-party subpoenas issued in this matter. It is incumbent that the Court make clear that such tactics will not be accepted nor tolerated in this judicial district.

**State Farm's Illicit Attempts to Gain the Upper Hand in Litigation**

State Farm has shown it will take whatever means necessary to gain litigation advantage no matter whether ethical or even illegal. Perhaps most telling is the recitation of State Farm's long history of nefarious conduct and illicit claims practices set forth in *State Farm v. Campbell*, 538 U.S. 408 (2003). In *Campbell*, the United States Supreme Court reversed a $25 million punitive damages verdict (reduced from the original jury award of $145 million) against State Farm brought in a bad-faith action. *Id*. at 413-15. The decision to reverse was based solely on the case being "used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country" instead of "conduct directed toward the Campbells." *Id*. at 420. Notwithstanding, the record evidence concerning State Farm's nation-wide corporate policy to attack those who dare stand up to the giant's illegal practices was nothing short of chilling.

The record before the Court showed that State Farm undertook "a national scheme to meet corporate goals of capping payouts on claims company wide." *Id*. at 415. The evidence presented showed State Farm's corporate claims processes "has functioned, and continues to function, as an unlawful scheme . . . to deny benefits owed consumers by paying out less than fair value in order to meet preset, arbitrary payout targets designed to enhance corporate profits." *Id*. at 431-32 (Ginsburg J., dissenting). To effectuate this corporate goal, the evidence showed that State Farm

made a habit of "falsifying or withholding of evidence in claim files," and "unjustly attacking the character, reputation and credibility of a claimant and making notations to that effect in the claim file to create prejudice in the event the claim ever came before a jury."[1]  *Id*. at 432.  In fact, the trial court specifically found that State Farm's corporate policy was "deliberately crafted to prey on consumers who would be unlikely to defend themselves'" and to ensure that those being sued would have "little money and hence no real alternative but to accept an inadequate offer to settle a claim at much less than fair value."  *Id*. at 433.  It is the starkest indictment when none less than a Justice on the United States Supreme Court believes the presented evidence showed that the means used by State Farm to implement its "policies and practices" were "callous, clandestine, fraudulent, and dishonest."  *Id.* 436.

The *Radcliff* and *Campbell* cases demonstrate the extraordinary measures that State Farm will take to gain any advantage over judicial proceedings regardless of the means or cost.  The action before this Court is yet another example of what is quickly becoming a pattern showing State Farm's "take no prisoners" conduct, which is indicative of the nature of the litigation strategy it employs.  While the subpoenas at issue are likely just the start, they should also be the end of this illicit litigation strategy.  Just like in the above cited cases, State Farm is setting out to stigmatize Defendants and ruin their reputations to ensure that referral sources dry up, thereby decreasing the revenue needed to continue fighting the insurance giant in this case.  State Farm understands that while it cannot win this case on the merits, it can force clearly intended

---

[1]  For instance, in *Campbell* the perverse decision was made to have an adjuster write in the file that the driver (who had been killed in the accident) "was speeding because he was on his way to see a pregnant girlfriend" to help destroy the reputation of the man recently killed in a tragic accident.  *Id*. at 432.  In truth, the evidence showed that there never was a "pregnant girlfriend" and that the entire story had been made up out of whole cloth in a repulsive attempt by State Farm to merely enhance its litigation position.  *Id*.

underhanded consequences through the litigation that economically ruin Defendants and thereby force capitulation. These actions reek of injustice and this Court should make a clear and unequivocal point to State Farm that such tactical gambits will not be tolerated within the Middle District of Florida.

## II. ANALYSIS

### A. The Court Should Quash the Subpoenas Issued to Bank of America and Non-Party Law Firms.

A party has standing to quash a non-party subpoena under Rule 45 for claims of "privilege, proprietary interest, or personal interest in the subpoenaed matter." *Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 21, on reconsideration, 232 F.R.D. 6 (D.D.C. 2005); *accord Brown v. Braddick,* 595 F.2d 961, 967 (5th Cir. 1979);[2] *See also State of Florida v. Jones Chem., Inc.,* 1993 WL 388645 *2 (M.D. Fla. 1993). Moreover, the scope of discovery under a subpoena is the same as the scope of discovery under Rules 26 and 34. *Barrington v. Mortgage IT, Inc.*, 2007 WL 4370647 at *3 (S.D. Fla. 2007); *Wagner v. Viacost.com*, No. 06-81113-Civ, 2007 WL 1879914 (S.D. Fla. 2007); *See also* Fed. R. Civ. P. 45, Advisory Committee Notes—1991 Amend ("The non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34."). Thus, the subpoenas at issue must not be overbroad, burdensome, irrelevant and not likely to lead to the discovery of admissible evidence or otherwise overreaching and subject to objection. *See* Fed. R. Civ. P. 26. This of course is in addition to the specific requirements under Rule 45, such as the prohibition against disclosure of privileged documents, which separately requires a subpoena to be quashed.

---

[2] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981, and of Unit B of the former Fifth Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

**1.      State Farm's Subpoena to Bank of America Must be Quashed.**

One of the twelve non-party subpoenas State Farm has issued is to Bank of America, seeking the financial records from *all accounts* held by Defendants, including two specifically designated accounts.  A true and correct copy of this subpoena (with account numbers redacted) is attached hereto as Exhibit A.   The subpoena seeks virtually every document within Bank of America's possession for a closed commercial bank account and for the *personal* account owned by Dr. Kompothecras *and his wife*. There was absolutely no effort by State Farm to seek the consent from the owners' of these accounts, which is in clear derogation of Florida's banking privacy law, as well as its state constitutional privacy protections.[3]

**a)      The Bank of America subpoena violates Florida law.**

Florida protects an individual's expectation of privacy in financial records.  *Winfield v. Div. of Pari-Mutuel Wagering, Dep't of Bus. Regulation*, 477 So. 2d 544, 548 (Fla. 1985) (discussing Fla. Const. art. I, § 23); *Berkeley v. Eisen*, 699 So. 2d 789, 790 (Fla. 4th DCA 1997) (noting that court orders compelling discovery constitute state action for purposes of constitutional privacy rights).[4]   In addition to constitutional protection, Florida Statutes Section 655.059(2)(b) requires financial institutions to keep confidential nonpublic account information except upon authorization from the account holder.   Specifically, Section 655.059(2)(b) deems confidential books and records of deposit accounts at any financial institution and further states that such documents "shall not be released except upon express authorization of the account holder."  *Banc*

---

[3] It is of no surprise that State Farm did not request these banking records in its lengthy Request for Production under Rule 34.

[4] A federal court sitting in diversity cases, when deciding questions of substantive law, is bound by state court decisions as well as state statutes. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

*of Am. Investment Services v. Barnett*, 997 So. 2d 1154 (Fla. 3d DCA 2008) (quoting *Fla. Stat.* § 655.059(2)(b)).

State Farm has undertaken no effort to comply with the privacy provisions of the Florida Constitution nor the provisions of *Fla. Stat.* § 655.059, as it never even attempted to obtain the consent from the account holders at issue, one of whom is not even a party to this lawsuit. Moreover, this Court should not be persuaded by any argument that provisions of *Fla. Stat.* § 655.059 exempt such requests made through a subpoena. To the contrary, the statute clearly makes a distinction between court orders and compelling such documents through use of a subpoena, which is specifically reserved only for a "legislative subpoena." *Compare Fla. Stat.* § 655.059(1)(e) (requiring production in a civil matter only "as *compelled by a court* of competent jurisdiction") (emphasis added) *with Fla. Stat.* § 655.059(1)(f) (allowing production through "legislative subpoena"). Courts within the Eleventh Circuit have routinely understood and applied this distinction. *See, e.g., Berlinger v. Wells Fargo, N.A.*, Case No. 2:11-cv-459-FtM-99SPC (M.D. Fla., Feb. 28, 2012) (overruling objections to production under *Fla. Stat.* § 655.059 holding that "the statute allows for the records to be produced **upon an order** by a court of competent jurisdiction.") (emphasis added). Thus, as the subpoena to Bank of America seeks confidential and privileged banking documents, protected under Florida law from the unchecked subpoena power that State Farm attempts to wield, it must be quashed pursuant to Rule 45(d)(3)(A)(iii) (requiring a subpoena to be quashed that "requires disclosure of privileged or otherwise protected matter.").

Any attempt State Farm may make to use a sound-bite approach to this issue, by relying upon *Regions Bank v. Lynch*, Case No 2:08-CV-00031-FTM-UA-SPC, 2009 WL 395780 (M.D. Fla. Feb. 17, 2009), must also be rejected. While the *Regions Bank* decision was decided by this

Court, it was based upon extremely different facts than presented here.[5]  *Regions Bank* presented this Court with a claim in which the plaintiff sought the imposition of a constructive trust over approximately $2.1 million in funds stolen from Regions Bank in an elaborate banking fraud scheme.  *See* Regions' Response to Objections to Order of Magistrate, Case No 2:08-CV-00031-FTM-UA-SPC, (Dkt. 133) at 10, attached here to as Exhibit E.  Unlike the fishing expedition that State Farm has set off upon, Regions Bank actually presented proof of financial misconduct *before* seeking bank confidential banking records from the defendants.  Indeed, Regions Bank presented the Court with sworn testimony from the defendants' CFO "establishing that Regions' money used to fund the [transactions at issue] were wrongfully diverted into Certificates of Deposit by Pyramid and also wire payments directly to Tim Lynch [another defendant in the case]."  *Id.*

Moreover, the *Regions Bank* case wasn't about the issuance of non-party subpoenas or protective orders but rather discovery requests under Rules 33 and 34 to which the defendants did not object based on privacy or confidentiality issues.  *Id.* at 4-5.  This in and of itself makes *Regions Bank* distinguishable from this case.  Finally, this Court never ruled in *Regions Bank* that *Fla. Stat.* § 655.059(1)(e) allowed the issuance of non-party subpoenas for financial records.   To the contrary, it held that "the financial privacy statutes cited by Defendants (also not presented to the Magistrate) have specific exclusions for subpoenas and appropriate court orders.  *See* 15 U.S.C. § 6802(e)(8) and Fla. Stat. § 655.059(1)(e)."  This is an absolutely correct statement of law as the Gramm-Leach-Bliley Act, unlike *Fla. Stat.* § 655.059(1)(e), has a specific provision allowing the disclosure of banking records pursuant to a judicial subpoena.  Accordingly, the *Regions Bank* case provides no help to State Farm and the subpoena to Bank of America should be quashed.

---

[5] In the interest of disclosure, the undersigned was the attorney that represented Regions Bank and wrote the brief that the Court ruled upon.

## 2. Alternatively the Court Should Grant a Protective Order as to the Bank of America Subpoena.

Although the Court should quash the Bank of America subpoena pursuant to Rule 45, if such motion is not granted, the Court should still enter a protective order prohibiting, or at minimum severely limiting, the financial items requested from Bank of America. A protective order may be issued under Fed. R. Civ. P. 26(c) to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." In determining whether to issue a protective order, courts have an obligation to weigh the interests of the party seeking the discovery against the opposing party's interests in preventing it. *Farnsworth v. Procter & Gamble*, 758 F.2d 1545, 1547 (11th Cir. 1985). The standard for issuance of a protective order is good cause. *See* Fed. R. Civ. P. 26(c). The party resisting discovery has the burden to prove its objections by showing that the request "(1) does not come within the scope of relevance as defined in Fed.R.Civ.P. 26(b)(1) or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Wagner v. Viacost.com*, No. 06-81113-Civ, 2007 WL 1879914 at *1 (S.D. Fla. June 29, 2007).

Here, the bank records sought (including for a personal account co-owned by a non-party) have no relevance to the case at issue. State Farm, in its own words, distills the 51 page, five count, prolix Complaint filed in this action to the following paragraph:

> Therefore, all the claims asserted in State Farm's complaint are narrowly focused on the true relationships among the Defendants and the manner in which State Farm insureds were referred to Physicians Group clinics through Unlawful Hotline Referrals, and whether Physicians Group's charges to State Farm for services rendered to those specific patients were lawful.

*See* Motion to Dismiss Counterclaim (Dkt. 50) at 3. In spite of the scalpel precision State Farm wishes to project upon the Complaint, its discovery instead reflects the actions of a broad-sword

hacking litigant. Perhaps this is best seen by the actual language in the Bank of America subpoena. Not only does the subpoena seek "**All documents** . . . relating to **any account"** of the Defendants **from 2005 forward** it also requests:

> 2. All documents relating to any application by any of the Defendants from 2005 through the present for a loan, financing, or extension of credit, including any financial information regarding the Defendants' assets, liabilities, income or expenses.

Exhibit A at 10.

It is self-evident that "All documents" relating to any loan the Defendants have sought in the last **nine years** or their individual "assets, liabilities, income or expenses" for the same period have nothing whatsoever to do with the purported "narrowly focused" allegations of the Complaint that State Farm contends merely center "on the true relationships among the Defendants and the manner in which State Farm insureds were referred to Physicians Group clinics." Dkt. 50 at 3. Moreover, if there was any relevance to these financial records (which there is unequivocally not), such discovery could only be obtained post-judgment. Thus, taking into account the Defendants and a non-party's rights to protect confidential banking information from disclosure versus the lack of relevance such information would have to State Farm's claims and/or defenses to this matter there can be little argument that the balancing of interests militates in favor of the requested protective order prohibiting the discovery sought. *See Farnsworth*, 758 F.2d at 1547.

It is presumed, State Farm will argue that expansive banking records are needed and regularly granted in fraud cases. The Court should not accept such sophistry. State Farm has made it clear this is simply a case about whether its policy holders have been being treated under an illegal self-referral network. *See* Dkt. 50 at 3. No amount of banking records would help prove that narrow issue of law upon which State Farm rests the entirety of its case. Once it has been

established that there are no illegal self-referrals, this case must be dismissed as a matter of law and the expansive requests for banking records can provide no greater insight into this claim.[6] Accordingly, as the information requested in the Bank of America subpoena has been requested for no permissible purpose, but rather is designed solely to annoy, embarrass and oppress Defendants through the use of aggressive discovery tactics, which exponentially but needlessly drive up the cost of this litigation, good cause has been shown and a protective order must be granted. *See* Fed. R. Civ. P. 26(c); *Wagner*, 2007 WL 1879914 at *1.

### 3. State Farm's Subpoenas to Law Firms Must be Quashed.

State Farm has also begun issuing subpoenas to law firms that refer clients to Physicians Group for treatment. *See* subpoenas attached hereto as Composite Exhibit B. Even a cursory glance at the thirty-eight (38) categories of documents sought shows that State Farm is on nothing other than an impermissible fishing expedition and does not meet the requirements for permissible discovery under Rule 26. *See Barrington*, 2007 WL 4370647 at *3. Not only do the requests at issue have an incredibly overly broad temporal scope (10 years) and are not limited to issues related to State Farm policy holders, but the subpoenas also seek Protected Healthcare Information ("PHI") without any attempt to comply with the Privacy Rules codified as part of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") 42 U.S.C. §§ 300gg *et seq.*; 45 CFR § 164.512(e) or Florida privacy laws on the subject. Furthermore, the subpoena should be quashed as it seeks prohibited commercial information. *See* Rule 45(d)(3)(B)(i).

---

[6] Moreover, State Farm has made clear its positions that the allegations set forth in the Complaint do not require individualized review on a claims by claims basis. Such a position would be completely contradicted given the breadth of State Farm's discovery, which would require a review of each and every client's viewpoint of whether they felt deceived by actions Defendants allegedly took.

### a)      The subpoenas do not meet the requirements of Rule 26.

As discussed above, the scope of discovery under a subpoena is the same as the scope of discovery under Rules 26 and 34. *Wagner*, 2007 WL 1879914 *1. In the present case, the subpoenas issued cannot meet this standard. First, there is no reasonable time limitation on the subpoenas, which are essentially relating to "All documents" and/or communications for the last ten years to the present for any and all matters related to any of the Defendants. While this would be reason enough to quash the subpoenas, further inquiry not only shows the gross over breadth of the requests, but also State Farm's illicit intent to drive a wedge between Physicians Group and attorneys who refer their clients to the clinics for treatment. Indeed, only **three (3) out of thirty-eight (38)** requests are limited to issues related to State Farm policy holders:

> 3.      All documents reflecting payments of things of value made to Physicians Group relating to any person who made a claim for personal injury protection benefits, medical payment benefits, or uninsured motorist benefits under a State Farm policy.

> 11.      All documents reflecting communications with any of the Defendants regarding any person who was represented by YOU and made a claim for personal injury protection benefits, medical payment benefits, or uninsured motorist benefits under a State Farm policy.

> 14.      All documents reflecting communications with 1-800-ASK-GARY regarding any person who was represented by YOU and made a claim for personal injury protection benefits, medical payment benefits, or uninsured motorist benefits under a State Farm policy.

Exhibit B at p. 10-11. Every other document request simply takes a shotgun approach seeking virtually "all documents" that in anyway relate to the subpoenaed law firms' interactions with any of the Defendants. This type of general fishing expedition simply does not meet the requirements to obtain discovery under the Federal Rules. *See Davenport v. State Farm Mut. Auto Ins. Co.,* Case

No. 3:11-cv-632-J-JBT, 2012 WL 555759, at *2 (M.D. Fla. Feb. 21, 2012). This is especially true given State Farm's position taken with the Court that "all the claims asserted in State Farm's complaint are narrowly focused on the true relationships among the Defendants and the manner in which **State Farm insureds** were referred to Physicians Group clinics through Unlawful Hotline Referrals." (Dkt 50 at 3) (emphasis added). As such, any information requested that does not go to claims related to "State Farm insureds" are necessarily not relevant to a claim or defense of the parties or likely to lead to the discovery of admissible evidence. *See* Fed. R. Civ. P. 26(c). Accordingly, each of the subpoenas must be quashed.

### b) The subpoenas seek protected information without first seeking to comply with the requirements of HIPAA of Florida law.

Each of the subpoenas directed to law firms seek a myriad of information, which may and likely does contain patient's PHI. *See, inter alia*, Ex. B at Requests 13, 16, 17-20. It would be odd indeed if a medical practice treating a patient for injuries sustained in an auto-accident would not have correspondence that disclosed and shared such PHI with the patient's attorney. PHI is a term of art that is widely used under HIPPA and "means individually identifiable health information." 45 CFR § 160.103. In turn, "health information" means any information, including genetic information, whether oral or recorded in any form or medium, that:

(1) Is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

*Id*. Moreover, the Privacy Rule requires that a requesting party first confirm that reasonable efforts have been made to ensure that the patient has been given notice and opportunity to object or that

reasonable efforts have been made to secure a qualified protective order, or 2) the that the requesting party has made reasonable efforts to notify the patient or otherwise obtain a qualified protective order.  45 CFR § 164.512(e).[7]  As State Farm has made no effort whatsoever to notify these non-party patients of the fact it is seeking PHI the subpoenas must be quashed.  *See* Rule 45(c)(3)(A)(iii) (requiring a subpoena to be quashed that "requires disclosure of privileged or otherwise protected matter.").

### c)      The subpoenas seek commercial information.

The subpoenas issued to the law firms also seek a wide-range of commercial information that is not otherwise known to the general public, competitors and/or that is not relevant to this action.  *See*, *inter alia*, Ex. B at Requests 5-10, 26-38.  Rule 45(d)(3)(B)(i) permits the Court to quash subpoenas that require disclosure of exactly these type of documents.  The sheer amount of such irrelevant requests is dizzying.   Below is a representative sampling of requests contained in the subpoena that seek commercial information and otherwise have no relation to State Farm's claims framed in the Complaint:[8]

> 26.    All documents reflecting communications with any of the Defendants regarding
> the formation of the Aggressive Law Group, P.A.

---

[7] It is conceivable that State Farm will argue that the law firms are not covered entities under HIPAA and therefore they are free to trample upon patient rights, despite the fact that HIPAA's requirements extends to those obtaining PHI through a Qualified HIPAA Consent and Release. Notwithstanding, State Farm's continued efforts to obtain indirectly that which it knows could never be directly obtained shall be rejected.  Florida's constitutional and statutory right to privacy in medical records would still require notice and consent to these patients.  *See* Fla. Const. art. I, § 23; *accord Fla. Stat*. § 456.057.

[8] Perhaps the best example of State Farm's boilerplate mentality is the fact that each of the subpoenas to different law firms ask about the "formation of the Aggressive Law Group, PA," even though such a question could only logically be directed to one of the four firms.

30. All IRS forms, other than YOUR annual state and federal income tax returns, reflecting any payments made to, or received from, any of the Defendants.

31. All IRS forms, other than YOUR annual state and federal income tax returns, reflecting any payments made to, or received from, 1-800-ASK-GARY.

32. All communications with any of the Defendants regarding the establishment of law offices in any state other than Florida.

33. All communications with 1-800-ASK-GARY regarding the establishment of any law offices in any state other than Florida.

34. All communications with any of the Defendants regarding the establishment of any health care clinic in any state other than Florida.

35. All communications with any of the Defendants regarding the establishment of any medical or legal referral service in any state other than Florida.

36. All communications with 1-800-ASK-GARY regarding the establishment of any law offices in any state other than Florida.

37. All communications with 1-800-ASK-GARY regarding the establishment of any health care clinic in any state other than Florida.

38. All communications with 1-800-ASK-GARY regarding the establishment of any medical or legal referral service in any state other than Florida.

Exhibit B. As each of the subpoenas request commercial information, like the sampling above, that otherwise have no bearing on the claims set for in State Farm's lawsuit these subpoenas should be quashed pursuant to Rule 45(d)(3)(B)(i).

### 4. Alternatively the Court Should Grant a Protective Order as to Each Subpoena Issued to a Law Firm.

Presuming *arguendo* that the Court does not quash the subpoenas attached hereto as Exhibit B, which it should, a protective order prohibiting, or at minimum drastically reducing the requested

documents, should be entered. The foregoing sections discuss how the subpoenas issued to the four law firms do not come within the "scope of relevance as defined in Fed. R. Civ. P. 26(b)(1) or (2) and otherwise is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Wagner*, 2007 WL 1879914 at *1. Rule 11 demands that good grounds be established *before* making allegations in a complaint. Discovery is not the time to fish for facts that establish the propriety of claims pled but rather is designed for targeted requests to support the assertions made. The subpoenas attached as Exhibit B not only seek information wholly outside the scope of pleadings as framed by State Farm (*e.g.*, requests for documents related to the subpoenaed law firms or Defendants' plans to expand operations into other states) but also is designed to stigmatize Physicians Group and Dr. Kompothecras so that law firms no longer refer clients to their facilities for medical treatment.

This case provides a text-book example for the purpose of conducting a balancing test when ruling upon a requested protective order. *See Farnsworth v. Procter & Gamble*, 758 F.2d at 1547. On the one hand is State Farm's claimed need to inundate non-party law firms, which refer clients to Physicians Group, with subpoenas requesting documents on thirty-eight (38) categories ranging from "All documents" related to "any" conversation, meeting or correspondence with any of the Defendants, to the firm's tax documents, confidential plans for expansion and dealings with the Florida Bar. On the other hand, there is Physicians Group's essential need to have this Court protect law firms that choose to refer patients to Physicians Group for care from undue targeting by State Farm, which is merely attempting to increase the transactional costs of referring clients to Physicians Group. This tactic is straight out of State Farm's litigation playbook; sue first to claim the purported moral high ground, stigmatize the defendant, cut off its channels of business,

then sit back and wait until the opponent runs out of money to defend the matter since its sources of income have been destroyed through the effect reeked by propounded non-party discovery.[9]

The balancing test required by *Farnsworth* requires that the subpoenas to these law firm be stopped. State Farm has never presented even a scintilla of evidence suggesting wrongdoing between the subpoenaed firms and Defendants, let alone wrong doing related to State Farm's insureds (which are the only claims to which State Farm can have any constitutional standing to attack). The Court should not be persuaded by State Farm's unplead vague references alluding to rank speculation of alleged *quid pro quo* conduct between law firms and Defendants. None other than the Florida Bar undertook a multi-year investigation concerning this very issue and found *no evidence whatsoever* of such illicit conduct. Indeed, the head of the Florida Bar's enforcement division made clear in sworn testimony that the Bar did a thorough investigation into this area of purported concern and found it was unfounded:

```
20      Q.  Did you ever hear any allegations concerning
21  alleged quid pro quo arrangements with Ask Gary or
22  Physicians Group?
23      A.  Yes, I did.  And, in fact, I investigated that a
24  lot on my own.  I had our investigator do it.  But I felt
25  it was important because we were concerned about that at
```

Page 19
```
1  the beginning as well.  So, I must have called, gosh, 50
2  lawyers.  And since this is all over, I don't have my
3  notes anymore.  I'm going from memory.  But, yeah, I
4  called a lot of lawyers and I was actually -- I remember I
5  was actually surprised that a lot of them said, "No, we
6  don't have to send our clients to Ask Gary."  Some of them
7  said that the clients were already going to the Ask Gary
8  lawyers when they came to them.  Others said they were
9  sending the clients to the client's own lawyers.
```

---

[9] *See* Section II *supra.*

20

10   Q.  Lawyers or doctors?

11    A.  Doctors. I'm sorry. Doctors. I apologize.

12 Right. Doctors. That they didn't have to send them to

13 the Ask Gary doctors. And there have been -- since then

14 there are people that claim that this is going on, but I

15 have never found any proof. There was one guy -- and I

16 called everybody I could think of. We spoke with -- we

17 asked very detailed questions of all the -- I think it was

18 about 200 people that we investigated and I followed up

19 with them. I wasn't nice to these lawyers. I mean, I was

20 really trying to get at the facts. And they all said, no,

21 they weren't forced to go to some of those lawyers.

22      One gentleman --

23   Q.  Again, you said "lawyers."

24    A.  I'm sorry. Doctors. Doctors. Doctors.

25   Q.  That's all right. So, the 200 lawyers that you

1 investigated, called up, weren't very nice to, they were

2 saying they did not have to send their clients to

3 Physician Group's doctors?

4    A.  Ask Gary doctors. Right. Now, some of them said

5 that they were sending them there because those doctors

6 were really good. There was one lawyer -- I cannot

7 remember his name -- I was trying to think of it last

8 night -- said that they had -- that there was a surgeon

9 that I think works with the Ask Gary Physicians Group who

10 is really good and this lawyer said he sent his own wife

11 to this surgeon because he was so good. So -- but no

12 one -- as I've said, I was surprised that that's what I

13 found, that everybody said no, that the only person that

14 claimed that was this guy named -- he goes by Abogado

15 Will. He advertises in Orlando. I think it's William

16 McBride. I was thinking about him yesterday. He claimed

17 that there was some quid pro quo. So I kept questioning

18 him and said, "Well, give me an affidavit, show me

19 something," and he wouldn't. He said, "Oh, no, just

20 everybody knows." Well, I can't go into court with

21 "everybody knows." So I decided it was a competition

22 issue.

Deposition of Kathy Bible ("Bible Depo.") taken on September 18, 2013 at 18:20-20:22, relevant excerpts of which are attached hereto as Exhibit F. When the Florida Bar's own chief investigator decides it is merely a "competition issue" with jealous lawyers making unfounded accusations of a *quid pro quo* relationship between Defendants and referring law firms, State Farm must come forward with something more than naked assertions in an attempt to open the door to oppressive and maliciously targeted discovery.

Moreover, State Farm can obtain the exact information sought in the law firm subpoenas (Requests 21 – 25) directly from the state agencies and State Bar Associations. This is a critical fact as State Farm has already sent out an entire different batch of subpoenas to these entities seeking the exact same information, to which Defendants have not filed a Motion to Quash or Motion for Protective Order. This fact provides prime evidence establishing that Defendants have nothing to hide but simply wish to protect their business from being decimated by State Farm attempting to drive a wedge between them and referring law firms, which provides the good cause required for the Court to enter a protective order prohibiting the overreaching discovery sought by State Farm.[10]

## III. CONCLUSION

State Farm has made clear its belief that this case is simply about whether its insureds where being provided medical treatment through an illegal self-referral relationship. The Court

_____

[10] Likewise, State Farm used a preliminary report from the Florida Bar's Special Committee on Lawyer Referral Services to suggest that the Florida Bar had "unanimous" support to completely overhaul lawyer referral services, which would have potentially led to the 1-800-ASK-GARY business model becoming illegal as it sought to outlaw the ability of lawyer referral services to be owned and operated by medical providers. (Dkt. 1 at ¶ 8; Ex. 2). This is yet another example of how State Farm chose form over substance in drafting its Complaint, as the actual rule passed in 2014 reflect an utter rejection for the tact suggested in the preliminary report. *See* Exhibit G attached hereto.

should require State Farm to maintain consistent positions through discovery and should not allow State Farm to now expand the litigation for the sole purpose of attempting to wreck financial havoc on its smaller adversary. Indeed, the shocking over breadth of the discovery subpoenas at issue makes clear that State Farm is ginning up its tried and true playbook for abusive discovery with the hopes that it can spend Defendants into forced capitulation, which this Court should outright reject.[11] Accordingly, Defendants respectfully request that the Court quash the subpoenas attach hereto as Exhibits A and B. In the alternative, a protective order should be entered prohibiting the discovery sought or severely limiting the scope of what is required to be produced.

## REQUEST FOR ORAL ARGUMEMNT

Pursuant to Local Rule 3.01(j), Defendants respectfully request that oral argument be set on this matter and the Court reserve one (1) hour for argument.

---

[11] State Farm's attempts to squeeze Defendants' revenue from all sides is also clearly seen by its new tactic in state court cases seeking to stay all PIP matters (*e.g*., Physicians Groups' ability to collect long overdue payment from State Farm) until this federal case is resolved. *See* State Farm's Motion to Stay Proceedings Pending Resolution of Related Federal Action filed in the County Court for Sarasota County on May 30, 2014, attached hereto as Exhibit H.

## CERTIFICATE OF GOOD-FAITH CONFERENCE

Pursuant to Local Rule 3.01(g) the undersigned counsel conferred with counsel for Plaintiffs concerning the requested extension but could not come to agreement on relief sought herein.

DATED June 4, 2014.

Respectfully submitted,

*/s/ William P. Cassidy, Jr.*
JOHN E. JOHNSON
Florida Bar No.  593000
Primary:  jjohnson@jclaw.com
Secondary:  swalker@jclaw.com; mpatel@jclaw.com
WILLIAM P. CASSIDY, JR.
Florida Bar No.  332630
Primary:  wcassidy@jclaw.com
Secondary: bwalker@jclaw.com; leller@jclaw.com
NICOLE DEESE NEWLON
Florida Bar No.  0832391
Primary:  nnewlon@jclaw.com
Secondary: swalker@jclaw.com; mpatel@jclaw.com
**JOHNSON & CASSIDY, P.A.**
324 S. Hyde Park Avenue, Suite 325
Tampa, Florida  33606
Telephone:       (813) 699-4859
Facsimile:       (813) 235-0462
*Attorneys for Defendants, Physicians Group of Sarasota, LLC, Physicians Group, LLC, and Gary Kompothecras*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of June, 2014, this document was electronically filed with the Clerk of this Court by using the CM/ECF system, which will serve a copy on all counsel of record.

*/s/ William P. Cassidy, Jr.*
Attorney